[No. D001950. Fourth Dist., Div. One. July 18, 1986.]

MICHAEL E. L., a Minor, etc., Plaintiff and Appellant, v.
COUNTY OF SAN DIEGO, Defendant and Respondent.

518

## COUNSEL

Thacher, Hurst, Conaway & Zeidman, Dan Zeidman, White & Bright and David Bright for Plaintiff and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, and Nathan C. Northup, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**BUTLER, J.**—This appeal concerns the liability of the County of San Diego (County) under the rationale of the holding in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334], for damages arising out of (1) the claimed negligence of a psychiatrist employed by the County at the community mental health center (CMH) in failing to warn a wife of her husband's known dangerous propensities for the infliction of harm upon her and (2) the claimed negligence of a deputy sheriff in failing to protect her from her husband. The damages are sought by the guardian for Mikie, whose mother was killed by his father who then committed suicide. We shall hold the psychiatrist owed a duty to exercise reasonable care to avoid harm to the wife at the hands of her husband, but the psychiatrist and thus the County are entitled to immunity. We shall also hold the deputy sheriff and thus the County are not liable in the circumstances presented and affirm the judgment.

I

We state the facts as presented in the opening statement as amplified in pretrial and motion proceedings. October 9, 1977, Michael R. L. (Michael) shot and killed his wife Cecelia and then himself with the same weapon. This murder-suicide culminated months of marital discord. Cecelia left Michael in early 1977, and filed dissolution proceedings. A reconciliation followed and they resumed living together that summer in Ramona with their son, two-year-old Michael E. L. (Mikie). Michael's drinking and

irrational behavior continued. July 30, Michael repeatedly shot and eventually killed the family sheep dog, a friendly creature without dangerous propensities. Cecelia and Mikie were present.

Cecelia immediately reported the incident to the humane society. Michael told her she could leave but if she took Mikie, "you'll be next." Cecelia left that same day while Michael was burying the dog. Taking Mikie with her, she moved in with her parents whose residence was in county territory adjacent to El Cajon. She called the sheriff's department and reported the shooting. After talking with Cecelia at the house, Deputy Jonathan Logan told her there was nothing he could do. The problem was domestic and she should ask her lawyer to get a restraining order.

The next day, July 31, Cecelia's lawyer filed an amended petition for dissolution and secured an order restraining Michael from being around Cecelia. Michael was served with the restraining order August 5.

September 6, at 3 a.m., Michael called the California Highway Patrol and said he was going to shoot himself or someone else unless the police stopped him. El Cajon police officers found Michael in his parked truck. He was upset and weeping. He said he was having marital problems and wanted to talk with someone. The officers patted him down and found a shotgun and shells in the truck. Michael told them he came from Ramona, intending to shoot his wife, and had second thoughts. He wanted to speak to a psychiatrist.

The officers took Michael to the police station, compiled their report and called Cecelia to inform her of the episode. The report included Michael's statements he wanted to kill Cecelia, the officers' belief Michael would harm Cecelia given the opportunity and Cecelia's recognition Michael would try to harm her.

The officers filled out an involuntary commitment form and transported Michael to the CMH operated by the County. He was admitted shortly after 6 a.m. Admitting psychiatrist Dr. Blumenstein noted Michael's shaky appearance. Dr. Pappas examined Michael and ordered a battery of tests. Clinical psychologist Dr. Schorr administered the tests and determined Michael was an explosive paranoid with poor self-control, was emotionally immature and had a latent type of schizophrenia. He was a "walking time bomb."

Dr. Pappas saw Michael again. This time he knew Michael had intended to kill Cecelia and was armed when picked up by the police. He knew the officers considered him a danger to Cecelia and that she was aware of and acknowledged her peril. Dr. Pappas knew about Michael's prior violence,

the test results and Dr. Schorr's diagnosis Michael was an explosive paranoid and a latent schizophrenic. During this interview, Michael was relaxed, at ease with himself and anxious to get back to work.

Dr. Pappas released Michael September 7, the day following his admittance, without further evaluation or treatment at CMH other than telling Michael to see Dr. Olenik, a psychiatrist in private practice. Michael did not contact Dr. Olenik.

October 8, Michael telephoned Cecelia asking to see Mikie. Lying, he claimed his truck had broken down. She drove to Ramona, was threatened by Michael, submitted to his demand for sexual intercourse, rushed back to El Cajon and promptly called the sheriff. By happenstance, Deputy Logan was dispatched. Cecelia related Michael's admission to CMH, his release and the return to him of his gun. After hearing about her visit to Michael, Logan told her "Go in the house. Lock the door. And if the man shows up, call the Sheriff's Department and we can pursue a trespass action against him." Logan later told a civilian employee of the department the situation was potentially dangerous but there was nothing he could do.

The next day was Sunday, October 9. That afternoon, Michael came to his mother-in-law, Isadora's residence. Cecelia heard his truck and ran to the telephone. Her mother saw Michael who smashed a locked sliding glass door and chased Isadora, beating her with a lead pipe. She broke free and ran to a neighbor for help. Michael then shot Cecelia twice. She died instantly and he turned the gun on himself. Mikie was then in the house and for eight hours afterward, alone with the bodies of his parents while a sheriff's SWAT team surrounded the house. After firing tear gas, the SWAT team rushed the house and released Mikie to his grandfather. His grandmother, Isadora, sued the County on his behalf, the court granted the County's nonsuit motion following the opening statement and Isadora appeals.[1]

## II

The court granted the nonsuit as to CMH liability on two grounds. The holding in *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d 425, was inapplicable. If applicable, Welfare and Institutions Code[2] section 5154, included within the Lanterman-Petris-Short Act (LPS Act), part 1 of

---

[1]The parties stipulated the County was the sole defendant and Isadora as guardian the only remaining plaintiff and the negligence of the CMH employees and sheriff's deputies, if any, was attributable to the County. We thus ignore other party plaintiffs and defendants and look solely to the causes of action pleaded on Mikie's behalf.

[2]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

division 5, Community Mental Health Services, sections 5000-5550, immunized the County from liability for negligence of the psychiatrists. As to the deputy sheriff, the court concluded the opening statement did not state facts sufficient to create the special relationship between the deputy and Cecelia essential to fix County liability under *Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137].

III

■ A nonsuit following an opening statement is not favored. (*Greenwood* v. *Mooradian* (1955) 137 Cal.App.2d 532, 536-537 [290 P.2d 955].) Such nonsuit is warranted only when the court can conclude there will be no evidence of sufficient substantiality to support a judgment in favor of the plaintiff. (*Willis* v. *Gordon* (1978) 20 Cal.3d 629, 633 [143 Cal.Rptr. 723, 574 P.2d 794].)

IV

■ We first look to County liability arising out of Michael's placement at CMH for evaluation and treatment and look to the duty horse before reviewing the immunity cart.

"Once again the immunity cart has been placed before the duty horse. (See *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197 . . . .) We said in *Davidson* (pp. 201-202): 'Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity.'" (*Williams* v. *State of California, supra,* 34 Cal.3d 18 at p. 22.)

*Tarasoff* explains the duty of therapists who learn a patient in voluntary therapy presents a serious danger of violence to another: "We shall explain that defendant therapists cannot escape liability merely because Tatiana herself was not their patient. When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." (*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d 425 at p. 431.) The opening statement as amplified by pretrial dialogue and during the nonsuit motion hearing makes

clear Michael's dangerous propensities to harm Cecelia were known to her, her parents, the El Cajon police officers, Deputy Sheriff Logan, and CMH Doctors Blumenstein, Schorr and Pappas. The psychiatrists knew Michael was a walking time bomb. Other than telling him to see Dr. Olenik, the private practitioner, they did nothing. Michael departed CMH and returned to Ramona. The scene was set for the final act of this tragedy.

■ The County argues *Tarasoff* is inapplicable in the circumstances presented here. The *Tarasoff* killer, Prosenjit Poddar, was in voluntary therapy. Here, Michael, a person dangerous to others, was involuntarily committed to CMH for evaluation and treatment under the LPS Act.[3]

We are unable to perceive any distinction in *Tarasoff* duty of psychiatrists who deal with patients in voluntary therapy and those who evaluate and treat persons involuntarily committed under the LPS Act. The psychiatrist in private practice, putting aside the Hippocratic oath for the moment, who is consulted by a patient seeking voluntary therapy is free to accept or reject the engagement. A person seeking voluntary therapy at a public facility may be rejected if financially able to retain services elsewhere (see 54 Ops.Cal.Atty.Gen. 65 (1971)) or is not suitable for care or treatment in the public facility (§ 6000). However, once a psychiatrist takes on a patient for therapy, whether voluntary or under LPS Act compulsion, the resulting special relationship supports affirmative duties on the psychiatrist for the benefit of third persons (*Tarasoff, supra,* at p. 436).

This appeal presents an even stronger case for the imposition of the duty. Michael was involuntarily committed because he was a danger to Cecelia. The CMH placement itself, in contrast to Poddar's voluntary therapy treatments in *Tarasoff,* affirms the probability Michael was a danger to others. We conclude the *Tarasoff* duty to warn third parties is applicable to CMH psychiatrists. We next consider whether the facts before us on this appeal negate that duty to warn.

Cecelia, more than anyone, knew Michael was a danger to her. A restraining order issued in the dissolution proceedings restraining him from approaching her. Deputy Sheriff Logan told her to lock the doors and call the sheriff if Michael approached her parents' residence. She knew about his September 6 trip from Ramona with the expressed intention of killing

---

[3]For purposes of analyzing *Tarasoff* duty in an LPS Act setting, we shall assume without discussion Michael was involuntarily committed under section 5150. Later, we address this issue as a part of our section 5154 immunity analysis in which we conclude Michael's placement at CMH was indeed an involuntary commitment under section 5150.

her only to have second thoughts and his subsequent placement at CMH. She was aware of the CMH release and the return of the gun to Michael.

The opening statement concedes these issues. Thus, while Dr. Pappas has an obligation to use reasonable care to protect an intended victim from the danger of serious violence he perceives in a person placed at CMH for evaluation and treatment, we are unable to determine in this case what is required in the exercise of reasonable care to discharge that duty. To say a warning to Cecelia or others or notice to the police fulfills the duty is an exercise in futility. Every player in the drama was fully informed. To "take whatever other steps are reasonably necessary under the circumstances" as advised by *Tarasoff* calls for a jury determination as to what the psychiatrist should be required to do.

The opening statement referred to expected psychiatric testimony listing several steps Dr. Pappas should have taken such as warning Cecelia never to be alone with Michael and always to be sure other adults were present. Direct contact with her would emphasize and underscore the peril Michael presented to her. A psychiatric label to the effect Michael was dangerous to her health might well have persuaded her to take extraordinary steps to secure her safety. We do not presume to catalogue the steps reasonably necessary for a psychiatrist to fulfill a *Tarasoff* duty on these facts and conclude the question whether reasonable care was exercised should be left to the trier of fact.[4]

## V

Having examined the duty horse, we turn to the immunity cart. Section 5154[5] of the LPS Act at times here relevant provided: "The professional

---

[4]The Legislature apparently anticipated this dilemma in enacting Civil Code section 43.92, effective January 1, 1986, which provides a psychotherapist as defined in Evidence Code section 1010 has no monetary liability and a cause of action shall not arise as to the psychotherapist for failure to warn of and protect from a patient's violent behavior unless the patient communicates to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim. The duty to warn and to protect in that event is said to be discharged by the psychotherapist making reasonable efforts to communicate the threat to the victim and to a law enforcement agency. While the CMH doctors here are psychotherapists as defined in Evidence Code section 1010, Civil Code section 43.92, effective January 1, 1986, is not applicable to these events which occurred in 1983 and we do not consider it in our analysis.

[5]Neither the court nor the parties addressed section 5113 immunity which concern articles 1, 1.5, 4, 4.5 and 6. Sections 5150-5154 are included in article 1. As section 5154 is specifically directed at releases of persons made pursuant to article 1, and tracks section 5113, we conclude section 5154 as effective at times relevant here is the immunity applicable to early release. Section 5113 was amended by urgency statute effective September 30, 1985. As amended, section 5113 applies to LPS criminal or civil liability except as provided in sections 5154, 5173, 5259.3 and 5306. Civil and criminal immunities for 72-hour or earlier release are now specified by section 5154 which was likewise amended as we later discuss in footnote 6, *post*.

person in charge of the facility providing 72-hour treatment and evaluation, his designee, and the peace officer responsible for the detainment of the person shall not be held civilly or criminally liable for any action by a person released at or before the end of 72 hours pursuant to this article."

The LPS Act must be construed to promote the intent of the Legislature, among other things, to end the inappropriate, indefinite and involuntary commitment of mentally disordered persons, to provide prompt evaluation and treatment and to protect mentally disordered persons (§ 5001).

Chapter 2 of the act concerns involuntary commitment of persons in various categories, including those who are mentally disordered. Section 5150 provides for the placement at CMH of a person who, as a result of mental disorder, is a danger to others or to himself or is gravely disabled. The placement requires a written application.

During his opening statement, plaintiff's counsel exhibited to the jury a form filled out and signed by the El Cajon police officers entitled "Involuntary Commitment." The form outlined the circumstances under which Michael's condition at 3 a.m. was called to their attention and a statement of probable cause to believe, as a result of a mental disorder, he was a danger to others, all consistent with section 5150 requirements. The parties stipulated CMH was a properly designated facility providing 72-hour treatment and evaluation and the psychiatrists and clinical psychologist were facility employees.

However, plaintiff's counsel declined to stipulate those employees or any of them were a "designee" of the professional person in charge of CMH for purposes of section 5154 immunity and further declined to stipulate Michael's placement at CMH was accomplished pursuant to the involuntary treatment provisions of chapter 2 and the detention procedures prescribed in section 5150 of that chapter of the LPS Act.

Plaintiff's counsel argued the evidence would show Michael voluntarily committed himself pursuant to section 5003. As the section 5154 immunity extended solely to involuntary commitments, he argued section 5154 was inapplicable and the County was not immune from liability arising out of Michael's activities after his release as he was a voluntarily committed person. Offered the opportunity, however, to adduce such evidence or include a remark to that effect in his opening statement, counsel candidly admitted the only evidence of a voluntary commitment was the inferences to be drawn by the jury from Michael's phone call to the California Highway Patrol seeking help, his willingness to go to the police station with the El Cajon officers, his admissions of intent to kill Cecelia, and a statement in the police report to the effect he was voluntarily committed.

■ The court correctly concluded as a matter of law section 5003 did not authorize an LPS Act voluntary commitment and the proffered evidence was wholly insufficient to sustain a finding Michael voluntarily committed himself under provisions other than those prescribed in the LPS Act.

Section 5003 is included in chapter 1, General Provisions, of the LPS Act. "Nothing in this part shall be construed in any way as limiting the right of any person to make voluntary application at any time to any public or private agency or practitioner for mental health services, either by direct application in person, or by referral from any other public or private agency or practitioner." Section 5003 does not create a right to be admitted or treated at CMH. Section 5003 simply states the LPS Act does not limit the right of any person either personally or by way of referral to make a *voluntary application* to an agency for mental health services (see 54 Ops.Cal.Atty.Gen., *supra,* at p. 65). The LPS Act does not create or prescribe any procedures for a voluntary commitment. The LPS Act establishes procedures to end the inappropriate, indefinite and *involuntary commitment* of mentally disordered persons and to provide prompt evaluation and treatment of such persons (§ 5001). Voluntary commitments simply are not covered by the LPS Act. Instead, voluntary commitments of mentally disordered persons are provided for in division 6, sections 6000-6008 of the Welfare and Institutions Code. Division 6 is not part of the LPS Act. Section 6004 provides the person in charge of a county psychiatric hospital may receive, care for or treat any person who voluntarily makes a written application for care, treatment or observation and who is a suitable person for the same and is competent to make the application. Unlike the person involuntarily committed to CMH under the LPS Act, a voluntary adult patient may leave the facility at any time by giving notice to any staff member of desire to leave and completing normal departure procedures (§ 6005). Section 5003 saves from LPS Act preemption other provisions of law concerning the providing of mental health services to voluntary commitments. Section 5003 itself has nothing to do with such voluntary commitments.

■ The evidence is wholly insufficient to support a finding Michael voluntarily committed himself under other provisions of law. Plaintiff's counsel exhibited the involuntary commitment form to the jury, read from it and admitted no other writing existed with respect to Michael's commitment. He told the jury the circumstances of Michael's detention by the El Cajon police, their questioning, the discovery of the gun and shells, their report, including references Michael was a danger to Cecelia, and the delivery of Michael to CMH and his placement there. Michael's placement at CMH by the El Cajon police officers tracked the processes prescribed by and was accomplished through the involuntary procedures set out in section 5150. There is no evidence of a voluntary commitment.

## VI

 We turn to section 5154 as effective in 1983 and its applicability here.[6] Plaintiff's counsel declined to stipulate the CMH psychiatrists were a "designee" of the professional person in charge of CMH and he did not so characterize them in his opening statement.

Counsel have not cited and we have not found any cases dealing with section 5154 immunity and the meaning of the phrase "professional person in charge of the facility" or the word "designee." Section 5151 provides if in "the judgment of the professional person in charge of the facility . . . or his designee" a person can receive services without detention, such person shall be provided evaluation and other services on a voluntary basis. Section 5152 as effective at times relevant here provides for the release of a detained person before the elapse of 72 hours if "in the opinion of the professional person in charge of the facility, or his designee" the person no longer requires evaluation or treatment. Section 5152.1 requires the person in charge or his designee to notify the mental health director or his designee, and others, of the early release.

Michael was not detained at CMH for 72 hours. He was released September 7, some 33 hours after his placement there. In his opening statement, plaintiff's counsel told the jury Dr. Pappas saw Michael a second time: "Well, Dr. Pappas, next in order, sees [Michael] for a second time after the psychological tests are performed. Dr. Pappas sees [Michael] for about another fifteen minutes, comes face-to-face with the man, and he concludes that this is a nice fellow, that he's appreciative, that he's calm, that he wants to get back to work, so he puts him back out onto the street without taking any other affirmative steps toward protecting Cecelia . . . from this walking time bomb." He reiterated several times the fact Dr. Pappas released Michael. He told the jury the contents of the discharge report prepared by Dr. Pappas. Plaintiff's counsel does not contest Michael's early release or complain about any CMH failure to follow prescribed early release procedures. In pretrial discussions between court and counsel, which the parties agreed

---

[6]While not controlling on this appeal, we note amendments to section 5154 by an urgency statute effective September 30, 1985, to cause civil and criminal immunity for 72-hour or earlier release track an amendment to section 5152 setting out procedures for and the designations of professional persons responsible for the early release of a person admitted to an LPS facility. This section 5152 amendment elaborates upon the designations of releasing authorities to include the psychiatrist directly responsible for the treatment and his or her personal observations and other professional persons authorized to release. Conflicts as to release between such person and the psychiatrist are resolved by the medical director or his or her designee who shall be a psychiatrist if the director is not a psychiatrist. Early release is authorized only if the psychiatrist making the final decision is satisfied, based on personal observation, the committed person no longer requires evaluation or treatment.

could be considered by the court on the nonsuit motion, the facts included in the opening statement were extensively discussed and plaintiff's theory of County liability explained: "Dr. Pappas, the M.D. psychiatrist, then decided on his own to release Michael notwithstanding the conclusions of Dr. Schorr, the psychologist, because to him Michael appeared to be calm. There is a specific immunity for releasing or not releasing the patient; we agree with that. And that's really irrelevant because our case is not in any way based on when they released him. It is only based on what duties they had under Tarasoff to take reasonable care to protect a victim, a known, identifiable victim, who was Cecelia, once they did release him."

The opening statement supplemented as requested by plaintiff's counsel by the pretrial court-counsel dialogue concedes Michael's early release tracked section 5152 requirements, i.e., in the opinion of the professional person in charge of CMH, or his designee, Michael no longer required evaluation or treatment. It follows then, the admission Michael's release was proper requires the conclusion Dr. Pappas was acting as the professional person in charge or a designee of such person and entitled to section 5154 immunity.

## VII

Isadora did not claim Dr. Blumenstein or Dr. Schorr were under a duty to warn Cecelia of her danger from Michael.[7] The opening statement fingers Dr. Pappas as the person chargeable with such duty. The other doctors were excluded as giving rise to any CMH liability on account of their activities. We thus examine the scope of the section 5154 immunity as to Dr. Pappas.

The section says Dr. Pappas "shall not be held civilly or criminally liable for any action by a person released at or before the end of 72 hours . . . ." Isadora argues her claims against the County on Mikie's behalf are not based on Michael's postrelease action, i.e., killing Cecelia; as in *Tarasoff*, her claims are said to stem from the failure to do anything to protect Cecelia from danger at Michael's hands.

Having defined therapist duty, *Tarasoff* considered therapy immunity under Government Code provisions.[8] The court held Government Code

---

[7]Her opening brief on appeal, however, refers to Dr. Schorr's failure to warn Cecelia, and includes him with Dr. Pappas in her brief argument neither was a "designee."

[8]Inscrutably, *Tarasoff* grants section 5154 immunity to the campus police (deemed to be peace officers) who briefly detained and then released the killer Poddar. Apparently, the court considered the detainment was accomplished under section 5150 although the opinion is careful to exclude the LPS Act as a basis for its conclusions (see pp. 442-443, 450).

section 820.2[9] did not immunize the therapists and the university from liability for a failure to warn, pointing out *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352] limited section 820.2 immunity to the discretion exercised in the making of basic policy by legislative and executive basic policymakers to give them "sufficient breathing space in which to perform their vital policymaking functions" (*Tarasoff, supra,* at p. 445). The failure of the therapists to warn did not rise to that level. Government Code section 820.2 does not immunize CMH and the County in our case.

So far as failure of the therapists to confine Poddar was concerned, the court held them immune from liability under Government Code section 856. In reaching this conclusion, the court determined the section 856 immunity extended to persons authorized to request or recommend confinement and was not limited to those persons authorized to commit mentally disordered persons under LPS Act section 5150.

"The Lanterman-Petris-Short Act, in its extensive revision of the procedures for commitment of the mentally ill, eliminated any specific statutory reference to petitions by treating physicians, but it did not limit the authority of a therapist in government employ to request, recommend or initiate actions which may lead to commitment of his patient under the act. We believe that the language of [Government Code] section 856, which refers to any action in the course of employment and in accordance with any applicable enactment, protects the therapist who must undertake this delicate and difficult task. (See Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1064.) *Thus the scope of the immunity extends not only to the final determination to confine or not to confine the person for mental illness, but to all determinations involved in the process of commitment.* [Citation.]" (*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d 425 at p. 448, italics added.) Government Code section 856 includes like immunity to public entities and public employees for any injury resulting from a determination "whether to parole, grant a leave of absence to, or *release a person* confined for mental illness or addiction." (Gov. Code, § 856, subd. (a)(3), italics added.) The language underlined above in our quotation from *Tarasoff* refers to the failure of the therapists to detain Poddar and to release him without "'notifying the parents of [the victim] that their daughter was in grave danger from . . . Poddar.'" (*Id.,* at p. 433.) We read *Tarasoff* as saying a failure to warn coupled with a failure to detain is immune under Government Code section 856. Here, the

---

[9]Government Code section 820.2 provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

failure to warn was coupled with a release. Tracking the above-quoted *Tarasoff* language in the context of this case, the scope of the section 856 immunity extends not only to the final determination to release or not to release Michael for mental illness but also to all determinations involved in the process of release. Section 856 would appear to afford immunity from liability to CMH and the County. While this analysis of *Tarasoff* immunity suggests CMH and County immunity is afforded under Government Code section 856, we conclude section 5154 immunity applies.

We deal here with a specific statute creating immunity for the actions of an early-released person. Unlike the immunities of Government Code sections 820.2 and 856 discussed in *Tarasoff,* section 5154 is narrow and limited in scope and directed precisely at actions of persons who are released early.

As we have seen, the LPS Act seeks to end the inappropriate, indefinite and involuntary commitment of mentally disordered persons and others. A 72-hour involuntary placement for evaluation can be terminated and a detained person can be earlier released. The act thus assures a person properly detained the opportunity for early release. In recognition of the uncertainties implicit in the evaluation and treatment of mentally disordered persons involuntarily committed and the nature and character of their postrelease activities, the act recognizes some early-released persons may offer harm to others. Balancing the straitjacket of CMH commitment and resultant assurance the committed person will not harm others beyond CMH walls against the aim of the act itself to end indefinite confinements, we conclude the freedom of the committed person outweighs the shackles. The corollary to the early release and future conduct uncertainties is the immunity provided in section 5154—no liability for any actions by a person released at or before the end of 72 hours.

While Isadora's claim against the County rests on a CMH failure to warn or otherwise use reasonable care to protect Cecelia, that claim necessarily arises out of the murder by Michael, a postrelease activity. As that action is immune under section 5154, it follows that the claimed failure to warn is also immune. Free of CMH confinement, Michael was a gun pointed at Cecelia which fired the fatal shots. To immunize the shooting without including the activities which loaded the gun defeats the purposes of the act encouraging early release. The conduct of Dr. Pappas in the evaluation of Michael and his early release is entitled to the section 5154 immunity to postrelease activities.[10] The County shares that immunity. The nonsuit as to the CMH activities of the County was correct.

---

[10]We appreciate our holding suggests voluntary commitments may be converted into LPS Act involuntary commitments to insure section 5154 immunity for failure to warn third

## VIII

█ Isadora's complaint on Mikie's behalf also sought damages for Cecelia's death for failure of the sheriff's department to act with reasonable care in protecting Cecelia from harm. She claims the statements by Deputy Sheriff Logan while responding to the calls from Cecelia created a special relationship with the sheriff's department; a duty to protect Cecelia arose and the failure of the sheriff to carry out that duty imposes liability. (*Williams* v. *State of California, supra,* 34 Cal.3d 18 at p. 24.) An officer who directs a person to follow him into an intersection may be liable for negligence when that person is struck by a car. (*McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453].) When a deputy sheriff promised to warn a victim upon release of a prisoner and failed to do so, the failure to warn constituted negligence giving rise to liability when the released prisoner killed the victim. (*Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508].)

Here, Deputy Sheriff Logan did not create a special relationship when he talked with Cecelia on the two occasions. The murder did not result from any failure to investigate or to respond to the calls or from any promise or representation (*Hartzler* v. *City of San Jose* (1975) 46 Cal.App.3d 6 [120 Cal.Rptr. 5]) or any delay in broadcasting an alert (*Antique Arts Corp.* v. *City of Torrance* (1974) 39 Cal.App.3d 588 [114 Cal.Rptr. 332]) or failure to render aid (*McCarthy* v. *Frost* (1973) 33 Cal.App.3d 872 [109 Cal.Rptr. 470]).

The deputy sheriff did not create the peril in which Cecelia found herself. He took no affirmative action which contributed to, increased, or changed the risk. He did not assume any responsibility to protect Cecelia and there is no evidence of any detrimental reliance by her on any of his statements. (*Williams* v. *State of California, supra,* 34 Cal.3d 18 at pp. 27-28.)

We conclude Deputy Sheriff Logan did not create or assume a special relationship as to Cecelia and the County incurred no liability on these counts by reason of her death.

Judgment affirmed. County to have its costs on appeal.

Work, J., concurred.

---

persons of postrelease potential of dangerous proclivities of released persons. The suggestion assumes an LPS Act commitment for improper purposes without regard to the section 5150 placement procedures and an early release within the 72-hour period. While we need not now decide the issue, we doubt section 5154 immunity would be available to shield such commitment and early release from *Tarasoff* liability. Moreover, Civil Code section 43.92 arguably affords a defense for a failure to warn in voluntary commitment circumstances.

**WORK, J.,** Concurring.—Although I have concurred in the lead opinion, I write separately to specifically address one portion of Justice Staniforth's thoughtful dissent.

The dissent posit of an equal protection specter misses the analytical boat. The voluntariness or involuntariness of the commitment does meaningfully differentiate as to the legal issue in this case. The dissent suggests the affected classes are those victims who are damaged by acts of the persons released, one being allowed to sue the releasing authority where the commitment was voluntary, and another barred from doing so where the commitment was involuntary. However, the fact is that releasing authorities have no control over voluntarily committed patients. Those persons may sign out at will. There is no "release" which is subject to the discretionary control of the housing facility. The involuntarily committed may only be released in accordance with statutory guidelines, one of which is the discretion of staff. The departure of a voluntary patient imposed no liability on staff for an improvident release while, in the absence of statutory immunity, liability could be established on proper facts where the patient is subject to nonconsensual confinement. Considered in light of the legal authorities in the two situations, the relevant legal classes are distinct and different.

**STANIFORTH, Acting P. J.**—I respectfully dissent.

The majority would affirm a judgment of nonsuit following plaintiff's opening statement. To do so in the light of the law surrounding and protecting a party from such a precipitous end to a judicial claim takes judicial bravery above and beyond the call of that ordinarily required of trial and appellate judges. The evidence and the applicable law does not authorize such drastic disposition of plaintiff's rights.

The motion for a nonsuit (Code Civ. Proc., § 581c) is tantamount to a demurrer to the evidence (*Reaugh* v. *Cudahy Packing Co.* (1922) 189 Cal. 335, 339 [208 P. 125]) by which a defendant can test the sufficiency of plaintiff's case before presenting its own. (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 838 [206 Cal.Rptr. 136, 686 P.2d 656].) Such motion presents a question of law as to whether the evidence proffered before the trial court in support of the plaintiff's case would justify judgment for plaintiff.

On appeal we are required to evaluate the plaintiff's evidence under the same rules governing the trial court. (*Carson* v. *Facilities Development Co., supra,* at pp. 838-839.) The evidence must be accepted as true in the light most favorable to the plaintiff unless it is inherently incredible. All conflicts must be resolved and reasonable inferences drawn in the plaintiff's favor.

Where as here, the nonsuit was based on the plaintiff's opening statement we are required to assume that plaintiff can prove all favorable facts set forth. (See *Smith* v. *Roach* (1975) 53 Cal.App.3d 893, 897-898 [126 Cal.Rptr. 29], and cases cited therein.) The court, as it did here, may consider the opening statement as well as the matters that would probably come into evidence at the trial. A nonsuit on the opening statement is proper only when the court concludes there will be *no* evidence which would support a judgment in favor of the plaintiff. In *Willis* v. *Gordon* (1978) 20 Cal.3d 629, 633 [143 Cal.Rptr. 723, 574 P.2d 794], the Supreme Court held a nonsuit on the opening statement is warranted "'only when the court [can] conclude . . . from [all the facts and inferences] that . . . there will be no evidence of sufficient substantiality to support a judgment in favor of the plaintiff[s].' [Citations.] It is well established that '[w]hether a particular inference *can* be drawn from certain evidence is a question of law but whether the inference *shall* be drawn, in any given case, is a question of fact. . . .' [Citation.]" Thus the issue squarely presented to the trial court and to this court is: Can it be said as a matter of law that the opening statement made by Isadora's counsel is subject to no other reasonable construction other than that Isadora failed to sustain a prima facie case of negligence upon the part of the defendant County?

*Facts*

Michael R. L. (Michael) shot and killed his wife Cecelia. Immediately thereafter he shot and killed himself. This murder-suicide occurred one month after Michael's treatment at the county mental health facility (CMH) by Dr. Martin Schorr and Dr. Socrates Pappas. The deaths occurred one day after Cecelia met with Sheriff's Deputy Johnathan Logan. This action is brought by decedent's son, Michael E. L. (Mikie), two years old at the time and witness to the killings. He brings this action through his guardian ad litem seeking damages for wrongful death and negligent infliction of emotional distress.

I

The first issue presented is whether the therapists at the CMH owed but failed to discharge their duty to use reasonable care to protect Cecelia from the murdering potential of their patient Michael. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334].) Plaintiffs contend that *Tarasoff* imposes such a duty which was not relieved by the fact that Cecelia was aware of her husband's violent propensities; nor are they protected by the immunity statutes from liability. The second issue involves the liability of Deputy Sheriff Logan. Did he

owe a duty to act with reasonable care in responding to Cecelia's request for assistance. (*Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137].)

Concerning the *Tarasoff* issue, the representations before the trial court detailed the relationship between Michael and the hospital employee/therapist(s). The proffered evidence is summarized as follows: The admitting psychiatrist at CMH observed that Michael was shaking and had been drinking. He requested in writing that the evaluating therapist investigate and rule out the explosive and paranoid personality. Michael was later seen by Dr. Pappas, a staff psychiatrist, for an interview lasting approximately 15 minutes. Pappas ordered extensive testing by Dr. Schorr, a clinical psychologist. Neither Pappas nor Schorr were ever designated as being in charge by Dr. Higgins, the professional person in charge at CMH. Schorr's examination indicated a calm patient. A battery of tests were conducted. The Rorschach test revealed an inwardly angry explosive paranoid personality, poor self control, emotional immaturity orientation compatible with a latent type schizophrenia. Dr. Schorr concluded Michael was a dangerous person, comparable to a walking time bomb. Alcohol and other stresses could well be the fuse igniting the explosion.

Despite these findings, Schorr did not examine the police report revealing Michael's threat toward his wife and a dog shooting incident. He simply recorded the test results and passed them on to Dr. Pappas with his conclusions. Dr. Pappas and Dr. Schorr did not discuss the results of these tests, nor did Dr. Schorr consult with the other members of his team to assure Michael received proper treatment, nor did Dr. Schorr take any protective steps to insure the safety of Cecelia or the child. He did not contact authorities nor did he attempt to advise Cecelia of Michael's danger.

After these hours of psychological testing by Dr. Schorr, Dr. Pappas again met with Michael. Dr. Pappas had before him the results of this testing and knew from the report of the El Cajon Police that his patient had threatened to shoot and kill his wife and himself the day before. He knew Michael's history of marital and drinking problems and abusiveness to his wife; he knew Michael, in asking for psychological help, had been found crying beside his truck with weapons and ammunition inside. Dr. Pappas was also aware of the dog shooting incident. After a 15-minute interview, Pappas observed Michael to be calm and appreciative and eager to return to work. He thereupon released him from the CMH. At no time thereafter did Dr. Pappas or Dr. Schorr contact Cecelia in any way in order to warn her. Dr. Pappas attempted to contact Cecelia to warn her that Michael was at CMH but was unable to telephone her; no further attempts were made. Michael was advised to proceed with private psychological care, but neither Dr.

Pappas nor anyone else at CMH followed up to determine whether this was done.

Further evidence was proffered from Dr. Thomas Rusk, plaintiff's psychiatric expert. He was of the opinion the making of no attempt to counsel Cecelia on how to handle Michael's personality and his violent behavior, not to establish therapy for Cecelia, not to warn her to limit contact with him, and never to be alone with him, and not insuring that Michael was attending therapy on his own, fell below the standard of care, i.e., constituted negligence.

*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 431, explicitly sets forth the duty in a case such as this: "*When a therapist determines . . . that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.*" (Italics added.) To say there is not a *Tarasoff* duty under the facts as outlined in the opening statement of plaintiff is to ignore specific realities we are required by law to accept as fact.

It is argued since the *Tarasoff* case did not involve a facility established pursuant to the Lantermann-Petris-Short Act (LPS), therefore the rule of *Tarasoff* is not applicable. Whether this was an LPS confinement does not affect the determination of whether these doctors owed a *duty* under *Tarasoff*. The duty language of *Tarasoff* is not so limited. (*Tarasoff, supra,* at p. 431). (*Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594, 599-600 [162 Cal.Rptr. 724].) To impose a standard of care on a CMH hospital and its therapists—other than that imposed by *Tarasoff*—would undermine the important societal goals which were illustrated and expressed in *Tarasoff*.

## II

The majority determine as a matter of law that there was a statutory immunity protecting Drs. Schorr and Pappas. This may be true as a matter of fact; but such a conclusion doesn't derive as á reasonable inference from the opening statement of the plaintiff. Instead, plaintiff presented a picture which would allow for imposition of liability and preclude the application of the statutory immunities. *The majority assumes without discussion Michael was "involuntarily committed under section 5150"* and later discusses

and analyzes the issue on the unfounded premise the commitment was in truth and in fact an involuntary commitment under Welfare and Institutions Code section 5150.[1] Such a conclusion simply begs a most critical factual issue in this case. I conclude that whether Michael voluntarily submitted to treatment at CMH or was an involuntary transfer is a question of fact for a jury, not a basis for granting of nonsuit.

The trial court's reasoning that without immunity "you couldn't get people to do these jobs if they were going to be responsible for whatever happened once these people left or whatever" appears to be in violation of the *Tarasoff* court determination where it expressly balanced the competing policies in favor of protecting society. (*Tarasoff, supra,* at p. 440.) Broad immunity that would shield blatant negligent acts or omissions is contrary to very strong public policy. The Supreme Court has stated "The 1963 Torts Claims Act did not alter the basic teaching of *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 219 [11 Cal.Rptr. 89, 359 P.2d 457]: *'when there is negligence, the rule is liability, immunity is the exception.'"* (*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 798 [73 Cal.Rptr. 240, 447 P.2d 352], italics added.) Thus, "[u]nless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail." (*Ramos* v. *County of Madera* (1971) 4 Cal.3d 685, 692 [94 Cal.Rptr. 421, 484 P.2d 93].) The Supreme Court in *Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 792-793 [221 Cal.Rptr. 840, 710 P.2d 907], recently reiterated this basic principle stating: "We have also held that, 'in governmental tort cases "the rule is liability, immunity is the exception". . . . Unless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by the willful or negligent acts must prevail.' (*Ramos* v. *County of Madera* . . . .)"

We confront here proffered direct and circumstantial evidence of negligence upon the part of the CMH doctors who say there is immunity from liability in this circumstance where a patient committed to CMH, pursuant to LPS, informed his evaluating psychiatrist that at a specific place and time he was going to kill his wife with a particular weapon. The doctors assert thereafter the therapist could discharge the patient without further obligation to warn or to use reasonable care to protect the known victim. Such a view simply does not make sense in this latter part of the 20th Century. The "king can do no wrong" concept is long dead. The *Tarasoff* case, while not involving factually a public LPS hospital, yet discusses at length dangerous patients and cites cases involving professionals or hospitals connected

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

with public entities. (See Harris, *Tort Liability of the Psychotherapist* (1978) 8 U.S.F. L.Rev. 405, 425.)

## III

The critical question is in the words of *Lopez, supra,* 40 Cal.3d 780, whether the Legislature has *clearly provided for immunity.* Factually, there is no doubt the therapists at CMH owed a duty of care to Cecilia. They would be liable absent some *clear* grant of statutory immunity. (See also *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197 [185 Cal.Rptr. 252, 649 P.2d 894], and *Johnson* v. *County of Los Angeles* (1983) 143 Cal.App.3d 298, 307 [191 Cal.Rptr. 704].)

The County's motion for nonsuit was based in part upon the statutory immunities provided by Government Code section 855.8 and section 5154. By neither of these statutes has the Legislature "clearly" provided for immunity as a matter of law in these circumstances. Finally, as will be shown, as a matter of fact, section 5154 does not apply in this case because Michael voluntarily submitted himself for treatment at CMH.[2] Here, at a minimum, the question of voluntary versus involuntary treatment is in issue as a question of fact to go to a jury.

Government Code section 855.8, subdivision (a), grants immunity from tort liability to public entities and their employees for injuries resulting from a diagnosis or failure to diagnose mental illness or addiction in a patient and for failing to prescribe for mental illness. Mental illness includes "any condition for which a person may be detained, cared for, or treated in a mental institution," or a facility established by the County pursuant to Chapter 2 of LPS (Gov. Code, § 854.4.) This statutory immunity covers specific acts and omissions by public employees for failure to diagnose and failure to prescribe. (See Van Alstyne, Cal. Government Tort Liability Practice (1980) § 4.48, p. 399.) Clearly, Government Code section 855.8, subdivision (a), would protect public entities from errors in judgment as to whether a patient was mentally ill and therefore should be confined, or whether the patient is not mentally ill and should not be confined. Here, plaintiffs are not suing because of the decision to confine or not to confine, nor for any decision relating to whether Michael was mentally ill. In *Fish* v. *Regents of Univ. of Cal.* (1966) 246 Cal.App.2d 327 [54 Cal.Rptr. 656], the immunity section was applied to the decision of the physician that a

[2]It may be conceded that there are factual conflicts here as to what Michael said and what the police officer did and how the medical facility responded, that it is clear section 5154 provides immunity for the professional person in charge of the facility or his designee in the instances of *involuntary treatment* only. Whether Drs. Pappas and Schorr were "designees" does not appear in the evidence.

patient be confined for psychiatric observation. Where there has been faulty diagnosis resulting in the release of a mental patient as in *Hernandez* v. *State of California* (1970) 11 Cal.App.3d 895 [90 Cal.Rptr. 205], the immunity defense prevails.

In contrast, the *Tarasoff* duty does not focus upon the therapists' failure to diagnose, rather upon the dangerousness of the patient and the failure to warn. Dangerousness is not necessarily equated with mental illness. Finally, the immunity provided by Government Code section 855.8 was not raised or discussed in *Tarasoff.* The case did not factually involve a public entity and public employee. Thus, whether Drs. Schorr and Pappas failed to diagnose Michael correctly is not pertinent in this cause of action.

If it be assumed arguendo that the distinction between diagnosing mental illness and determining dangerousness is rejected, nevertheless Government Code section 855.8, subdivisions (c) and (d), provides specific exceptions to this grant of immunity. These parts state that this section *does not exempt a public employee from liability from injuries arising from negligence or other wrongful acts while "prescribing" treatment or in "administering" prescribed treatments.* The *Tarasoff* liability position falls squarely within these exceptions. (See Van Alstyne, *supra,* at p. 400.) Clearly, under Government Code section 855.8, there would be no immunity to the County of San Diego who would be vicariously liable for the therapists' negligence under Government Code sections 855.8 and 815.2. As was said in *Guess* v. *State of California* (1979) 96 Cal.App.3d 111, 119 [157 Cal.Rptr. 618], "under sections 856, 855.8 and 815.2 public entities are vicariously liable for such wrongs," i.e., injuries proximately caused by the negligence or wrongful acts of public employees.

IV

Nor is section 5154 a shield for these therapists at CMH from liability. The trial court in granting the motion for nonsuit stated that all professionals at CMH were automatically "designees" of the professional person in charge and therefore under section 5154. The legislative history of section 5154 indicates that it was designed to protect and immunize the *policymakers* of a governmental entity from liability.

Section 5154 specifically provides immunity from liability for any action of a patient released from a 72-hour evaluation facility for "*the professional person in charge of the facility*" or "*his or her designee.*" This language was a marked change from the language used in former sections 5047 and 5551, the apparent precursors of sections 5150 through 5154 of the present code. The derivation of current section 5154 is both former sections 5047

and 5551. The former sections addressed the procedure for examination and evaluation of the alleged mentally ill person. Former sections 5047 and 5551 provided: "when a petition [for a mental examination] is filed by any such person, neither the person making or filing the petition, nor his superiors, nor the department, hospital, or institution to which he was attached *nor any of its employees* shall be rendered liable. . . ." (Italics added.) Clearly, *when the Legislature sought to protect a broad spectrum of persons it specifically listed "employees" of the facility.* In contrast, the Legislature in revising the section limited the immunity provided by section 5154 by referring only to the "*professional* person in charge" or "his or her designee."

Furthermore, that the Legislature specifically sought to limit immunity to those policymaking employees the head of the institution is supported by the history of sections 5150 through 5154. As originally presented to the Assembly, section 5151 declared that a person may be provided evaluation and treatment without being detained "in the judgment of the individuals providing evaluation." This language was replaced with "in the judgment of the professional person in charge of the facility . . . or his designee, . . ." When section 5154 was added the limiting language was included in that statute as well. It is abundantly clear the Legislature *opted for language which granted restricted immunity to those in policymaking position.* It should be further noted that under the LPS where the Legislature has intended an immunity to be all inclusive the statute was written as: "no person shall be held liable" or "any individual." (See former § 5203 and current § 5203.) Thus, it is difficult or impossible to conclude that the "designee" is the individual doctor providing evaluation. At minimum there is an ambiguity in the statutes. *Ramos, supra,* 4 Cal.3d 685, and *Lopez, supra,* 40 Cal.3d 780, hold *unless the Legislature has clearly provided for immunity, liability must prevail.* Furthermore, these interpretations favoring liability of the individual doctor/nondesignee are in keeping with the legislative acts and purposes in providing immunity for discretionary acts and omissions under the Torts Claims Act of 1963, but allowing liability for ministerial or nondiscretionary functions. (Gov. Code, § 820.2; Van Alystyne, *supra,* at pp. 115, 139.) Thus, section 5154 should be interpreted in harmony with the Torts Claims Act of 1963 and prior judicial interpretations of this particular grant of governmental immunity.

From the foregoing analysis of the statutes in question it is clear that the immunity provided by section 5154 does not extend to Drs. Pappas and Schorr. The doctor in charge at CMH at the time of Michael's admission was one Dr. Higgins. There is no evidence that Dr. Higgins designated either Pappas or Schorr as the person in charge of the facility or that they were in line for such a designation. Dr. Pappas was a staff psychiatrist whose function was to evaluate and determine treatment. Dr. Schorr was a

testing psychologist. Neither were in a position *to make discretionary* decisions. Their immunity would not enhance the obvious legislative purposes to be found in section 5154.

## V

Assuming arguendo section 5154 does apply to all professionals working in an LPS facility, it is clear this would bar recovery *only if treatment was involuntary.* The majority concedes there exists no statutory immunity for public entities or public employees when the patient has voluntarily admitted himself for treatment in a 72-hour evaluation facility.

Here, the evidence when viewed most favorably to the plaintiff shows a voluntary commitment. The form used by the El Cajon Police to transfer Michael for treatment to CMH was a standard form application for *involuntary detainment* pursuant to section 5150. However, the fact that the police officers used such a form is not irrefutable proof the admission was involuntary. There is considerable evidence to the contrary showing Michael voluntarily admitted himself to CMH. Michael made the initial contact with the police on September 6, 1977, claiming he was on his way to kill his wife; wanting to speak with a psychiatrist. Most significant is the report of the El Cajon police officer who took him into custody who stated in his report: *"The subject was then asked if he would voluntarily commit himself to CMH for observation and replied that he would be willing to talk with a psychiatrist at that location. He voluntarily accompanied Officer Hill to the El Cajon Police Department where this report and a voluntarily commitment form were prepared."* (Italics added.) The (§ 5150) form used by the police officer on its face would suggest that this was an involuntary commitment therefore arguably subject to whatever immunity is granted under section 5154. However, upon trial evidentiary matters should be produced to show why the officer used this form. No other form is available for a voluntary commitment? The officers wrote that *it was a voluntary commitment* in their reports; they nonetheless used the involuntary transfer form. It is reasonable to infer from the police report that the officer thought he filled out a voluntary commitment form.

There is evidence that a separate form at CMH (a voluntary commitment form) *was not signed by Michael.* Once again, there may be a variety of reasons advanced for this not being signed: clerical error; misunderstanding; Michael's refusal to sign for reasons unconnected with his volunteering for treatment.

In sum, the point is that neither the section 5154 department involuntary form prepared by the police or the unsigned CMH voluntary form is at all

consistent with Michael's clear and unequivocal request for help and voluntarily entering the hospital. He called the CHP for help; he volunteered to accompany the El Cajon police officers; he was cooperative with the CMH staff; in fact, he was so cooperative and cordial that he lured Dr. Pappas into believing he was not a danger. In face of this evidence, the trial court determined as a matter of law this was an involuntary treatment. This was error. This was a factual decision that must be left to a jury.

## VI

Finally, to interpret the Welfare and Institution Code section as the County would desire is to immediately raise the specter of a denial of equal protection. If the County is correct, under LPS, there exist two separate classes of *Tarasoff* tort victims. First, those who are maimed or killed by a voluntarily treated ex-patient who had been released on their own; and secondly, those who have been maimed or killed by an involuntarily treated ex-patient who had been released on his own. The former can sue but the latter cannot. Thus, the question is, from a constitutional point of view, what rational relationship is there between having two such separate classes of tort victims and any legitimate state interest.

Equal protection clauses require "that persons under like circumstances be given equal protection and security in the enjoyment of personal and civil rights, the acquisition and enjoyment of property, the enforcement of contracts and the prevention and redress of wrongs, . . ." (5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 336, p. 3630.) Once a person is released from CMH who has obtained voluntary treatment on his own, he becomes an ex-patient whether he was initially treated voluntarily or involuntarily. (See § 5152.) And the County has the same degree of control or lack of control over each type of ex-patient who is released on his own. Thus, any one potential tort victim is in precisely the same position as any other potential tort victim whether the ex-patient tortfeasor is one class or another. Thus, there exists no basis in reason for distinguishing the two classes.

In *Brown* v. *Merlo* (1973) 8 Cal.3d 855 [106 Cal.Rptr. 388, 506 P.2d 212], the California Supreme Court was faced with the problem of tort immunity by reason of the guest statute. The statute was written to protect the hospitality of the host driver, to prevent collusion between the host driver and the guest passenger. The Supreme Court invalidated this statute saying in summary: "[W]e have concluded that the classifications which the guest statute creates between those denied and those permitted recovery for negligently inflicted injuries do not bear a substantial and rational relation to the statute's purposes of protecting the hospitality of the host-driver and

of preventing collusive lawsuits. We therefore hold that, as applied to a negligently injured guest, the guest statute violates the equal protection guarantees of the California and United States Constitutions." (*Id.*, at p. 882.) Settled rule requires that a statute be interpreted if rationally possible to avoid constitutional invalidity. As applied here by the majority, section 5154 is invalid.

## VII

### *The Williams Issue*

The trial court held that Deputy Sheriff Jonathan Logan owed no duty of care to Cecelia. The rule is that a person ordinarily owes no duty to come to the aid of another unless there is a relationship between the two of them that gives rise to the duty to act. Thus, the issue here is whether factually it could be reasonably inferred by the opening statement here that Logan did owe a duty to Cecelia.

When the government, through its agents, voluntarily assumes the protective duty toward a member of the public and undertakes action on behalf of that member and thereby inducing reliance, it is held to the same standard of care as a private individual. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 24 [192 Cal.Rptr. 233, 664 P.2d 137]; *Lopez* v. *Southern Cal. Rapid Transit Dist., supra,* 40 Cal.3d 780, 799 [221 Cal.Rptr. 840, 710 P.2d 907]; see Note, *Police Liability For Negligent Failure To Prevent Crime* (1980-81) 94 Harv.L.Rev. 821, 824.) The requirements of a special relationship before such duty arises applies in areas of law enforcement and police activities. (See *Hartzler* v. *City of San Jose* (1975) 46 Cal.App.3d 6, 9, 10 [120 Cal.Rptr. 5].) In *Williams, supra,* our Supreme Court established criteria to determine whether a special relationship existed between a police officer and a citizen—thereby creating a duty of care. The requisite special relationship can be found (1) if the officer took any affirmative action which contributed to, increased or changed the risk which would have otherwise existed, or (2) the officer voluntarily assumed responsibility to protect the individual, or (3) the individual detrimentally relied on the conduct of the officer in statements made by him which induced a false sense of security thereby worsening the individual's position. (*Williams, supra,* at pp. 27-28.) Without question, the first and third criteria set forth above in *Williams* are satisfied. Deputy Sheriff Logan responded to Cecelia's complaint and informed her there was nothing he could do about Michael's forcing her to submit to sexual intercourse. However, Logan recognized the potential danger imposed by Michael and he took the affirmative step of advising Cecelia to stay at her parents' home; to lock the doors; call the sheriff's department if Michael showed up. This increased the risk it may

be argued factually. Isadora's residence was perhaps the most dangerous place for her to remain. Once Logan affirmatively acted to inform Cecelia how to protect herself he had the duty to use due care in providing such information. (See *Mann* v. *State of California* (1977) 70 Cal.App.3d 773, 780 [139 Cal.Rptr. 82].) He should have told her to secrete herself in a place where Michael could not find her until she had time to file charges for false imprisonment, etc.

Further, Cecelia relied to her detriment on Logan's statement that she should stay at Isadora's home and lock the doors and call the sheriff's department if Michael arrived. This advice created a false sense of security it may be argued. A professional law officer was giving this advice. By advising her, he, the expert, lulled Cecelia into a false sense of security that she would be safe thereby causing her to forego seeking other forms of protection. Cecelia was in fact where Logan advised her to be when her husband killed her the next day.

Cases relied upon to reject the existence of special relationship by the County are distinguishable. In *Davidson* v. *City of Westminster, supra,* 32 Cal.3d 197, the injured party was totally unaware that the police officers were present conducting surveillance. The victim could not have relied upon the officers' protection. Thus, there is no officer-induced reliance to be claimed. However, the *Davidson* court did emphasize that a special relationship could be found where the injured party depended upon the expertise and training of the police officer. (*Id.,* at p. 207.) In *Mann* v. *State of California, supra,* 70 Cal.App.3d 773, the police officer investigating a traffic accident took affirmative steps to provide assistance lulling the parties into a false sense of security to their detriment.

The plaintiffs here proffered (through an expert retired Sheriff's Sergeant Carl) evidence that the following advice should have been given: "Don't stay at your parents' home because he can find you there. Go somewhere where he doesn't know anything about. Secrete yourself. Then go to the D.A. on Monday and ask them to file a criminal complaint." Whether Cecilia would have been killed later after having filed a criminal complaint is not relevant to the fact that she was killed on Sunday, the day following the improper advice by the police officer. The foregoing facts should have been presented to a jury in order to determine whether they fit within the requirements of the *Williams* rules. Finally, Logan had placed Cecelia in a dangerous position by reason of reliance upon his advice.

No rules of statutory immunity exonerate his negligence. (See *Mann* v. *State of California, supra,* 70 Cal.App.3d at pp. 778-779.) There is no factual allegation to bring this case within a "failure to provide police

protection" which is immunized under section 845 as a legitimate policy decision. Rather, this is a case involving a charge of negligence in the performance of duty by Deputy Sheriff Logan. Thus, as said in *Mann,* the police protection immunity does not apply. (*Id.,* at p. 779.)

For each of the foregoing reasons, I would reverse and remand for further proceedings in the trial of this matter.

Appellant's petition for review by the Supreme Court was denied October 22, 1986. Bird, C. J., was of the opinion that the petition should be granted.