[No. F032740. Fifth Dist. June 7, 2001.]

STANLEY FORD, an Incompetent Person, etc., Plaintiff and Appellant, v. ROBERT NORTON et al., Defendants and Respondents.

COUNSEL

Hunt & Associates and Eric J. Parkinson for Plaintiff and Appellant.

Catherine I. Hanson and Astrid G. Meghrigian for California Medical Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Daniel H. Willick for California Psychiatric Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Marderosian, Oren & Paboojian and Michael E. Lehman for Defendant and Respondent Robert Norton.

Baker, Manock & Jensen, Gayle D. Hearst and Michelle E. Guardado for Defendant and Respondent Harvey Biala.

Koenig Caprile & Berk, William J. Koenig and Jeanne L. Vance for California Psychological Association and California Association of Psychology Providers as Amici Curiae on behalf of Defendants and Respondents.

Nathalie Gilfoyle; Heller, Ehrman, White & McAuliffe, Christian E. Mammen and Jonathan R. Dowell for American Psychological Association as Amicus Curiae on behalf of Defendants and Respondents.

## Opinion

LEVY, J.— ■ The Lanterman-Petris-Short Act (LPS Act)[1] is intended to provide prompt, short-term, community-based intensive treatment, without stigma or loss of liberty, to individuals with mental disorders who are either dangerous or gravely disabled. (*Conservatorship of Chambers* (1977) 71 Cal.App.3d 277, 282 [139 Cal.Rptr. 357].) When involuntary intensive treatment is indicated, the LPS Act authorizes the detention of mentally disordered persons for a 72-hour treatment and evaluation. (§ 5150 et seq.) Thereafter, the patient may be certified for additional involuntary detentions. (§ 5250 et seq.)

The central issue in this appeal is whether a psychologist who releases an involuntarily hospitalized mental patient before the end of the 72-hour treatment and evaluation hold is exempt from civil liability when that patient thereafter injures another person. The trial court concluded that, although the operative statute restricts immunity to "the psychiatrist directly responsible for the person's treatment," a psychologist is also exempt. In reaching this result, the trial court relied on *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1 [270 Cal.Rptr. 796, 793 P.2d 2].

However, the trial court misconstrued the impact of *California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d 1, on the situation presented here. Under sections 5152 and 5154, only "directly responsible" *psychiatrists* are exempt from liability. Consequently, the trial court's dismissal of the underlying complaint must be reversed.

### Statement of the Case and Facts

Appellant, Stanley Ford, voluntarily admitted himself to a psychiatric hospital for care and treatment. At the time of his admission, respondent Robert Norton, a psychologist, and Dwight Sievert, a psychiatrist, evaluated Ford. Ford was found to be "psychotic and/or schizophrenic." Thereafter, Ford was placed in the "open unit" of the hospital and given antipsychotic medications.

However, after approximately four days at the hospital, Ford's condition worsened. A night nurse called respondent Harvey Biala, a psychiatrist, at his home to report on Ford and receive guidance on how to proceed. Biala told the nurse to arrange for Ford to undergo an assessment by the appropriate professional to determine whether Ford met the criteria for involuntary

---

[1]Welfare and Institutions Code section 5000 et seq. All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

detention under section 5150 and, if so, to transfer Ford to. the locked ward of the hospital. Biala had not been treating Ford. He was contacted only because he was on call for Sievert.

Thereafter, Scheree Lau, a licensed clinical social worker, performed the section 5150 assessment. Lau determined that Ford was "gravely disabled" and a "danger to others." Ford was then transferred to the psychiatric intensive care unit and involuntarily detained.

The following morning, Norton spent approximately 30 to 40 minutes with Ford and determined that he should be released from the involuntary detention. Shortly thereafter, Norton spoke with Biala for approximately five minutes regarding Ford. Acting on Norton's advice, Biala wrote Ford a prescription for antipsychotic medication and medically cleared him for discharge from the hospital. Norton then wrote an order for Ford's discharge.

Less than 12 hours after Ford was placed under the section 5150 hold he left the hospital. Within five hours of his discharge, Ford returned to his apartment and stabbed his roommate in the back. Ford's roommate survived but was seriously injured.

Ford was charged with criminal assault, found not guilty by reason of insanity and incarcerated in the state hospitals at Atascadero and Napa.

Based on his treatment at, and early release from the psychiatric hospital, Ford, by and through his guardian ad litem, Michael P. Ford, filed the underlying medical malpractice action. Ford alleges that if he had received proper treatment from respondents while under their care and if he had been held for the entire 72-hour treatment and evaluation, he would have neither injured his roommate nor suffered the resulting consequences. His claimed damages include lost wages, medical and hospital expenses, and emotional distress.

Trial of this case began with hearings on the parties' various motions in limine. In arguing Ford's motions, counsel made offers of proof that amounted to what was essentially an opening statement. Immediately thereafter, before a jury was empanelled, respondents moved for nonsuit. The sole basis for respondents' motion was that they were immune under section 5154.

The trial court granted the motion for nonsuit and the action was dismissed. Relying on *California Assn. of Psychology Providers v. Rank, supra,*

51 Cal.3d 1, the court ruled that wherever "psychiatrist" is found in sections 5152 and 5154 it must be replaced with the phrase "psychologist or psychiatrist." Based on this interpretation of these statutes, the court concluded that both Norton and Biala were immune from liability for the aftermath of Ford's early release.

## DISCUSSION

Under the LPS Act, a person who is dangerous or gravely disabled due to a mental disorder may be detained for involuntary treatment. However, in accordance with the legislative purpose of preventing inappropriate, indefinite commitments of mentally disordered persons, such detentions are implemented incrementally. (*Michael E. L. v. County of San Diego* (1986) 183 Cal.App.3d 515, 530 [228 Cal.Rptr. 139].) Further, these involuntary placements can be terminated before the expiration of the commitment period. Thus, the LPS Act assures a person properly detained of an opportunity for early release. (183 Cal.App.3d at p. 530.)

However, the LPS Act also recognizes that the early release of involuntarily committed patients can pose a risk of harm to others. The evaluation and treatment of mentally disordered persons is inherently uncertain and cannot reliably predict future conduct. Nevertheless, the Legislature determined that the act's goal of ending indefinite confinements outweighed the early release potential for harm. Consequently, as a corollary to the early release provisions, the LPS Act exempts specified persons from civil or criminal liability. (*Michael E. L. v. County of San Diego, supra,* 183 Cal.App.3d at p. 530.)

At issue in this proceeding is the 72-hour treatment and evaluation authorized by section 5150, the first step in the involuntary commitment process. This section provides that when any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, specified persons may cause that mentally disordered individual to be placed in a designated facility for 72-hour treatment and evaluation. The persons who may take such action include peace officers, members of the staff of the evaluation facility, designated members of a mobile crisis team, and other professional persons designated by the county. Thus, a broad range of personnel can initiate the placement of a mentally disordered individual for the 72-hour evaluation.

Once a person is admitted to a facility under section 5150, he or she must receive an evaluation as soon as possible. (§ 5152, subd. (a).) Thereafter, the person may be released before 72 hours have elapsed. However, section

5152 imposes restrictions. An early release may occur "only if, the psychiatrist directly responsible for the person's treatment believes, as a result of his or her personal observations, that the person no longer requires evaluation or treatment." (§ 5152, subd. (a).)

The process set forth in section 5152 for resolving a dispute between a psychiatrist and another professional over whether to terminate a 72-hour detention further confirms that a *psychiatrist* must make the decision. If another professional person who is otherwise authorized to release the patient believes that the 72-hour detention should be terminated, that professional has no direct power to effectuate an early release. Rather, if the psychiatrist directly responsible for the patient's treatment objects to the other professional's recommendation, the matter is referred to a second psychiatrist for a final decision. (§ 5152, subd. (a).) Thus, although the LPS Act permits a broad range of persons to initiate a 72-hour detention, only a psychiatrist can authorize an early release.

As noted above, to advance the goal of ending indefinite commitments, the LPS Act exempts certain individuals from liability following a patient's early release. Here, the pertinent exemption is found in section 5154, subdivision (a). That section provides, in part: "[I]f the provisions of Section 5152 have been met, the professional person in charge of the facility providing 72-hour treatment and evaluation, his or her designee, the medical director of the facility or his or her designee described in Section 5152, and the psychiatrist directly responsible for the person's treatment shall not be held civilly or criminally liable for any action by a person released before the end of 72 hours pursuant to this article." Thus, unless section 5152 has been complied with, this exemption from liability is not operative.

In this case it was a psychologist, not a psychiatrist, who personally observed Ford and made the decision to release him before 72 hours had elapsed. Although a psychiatrist was consulted, his involvement was minimal and did not include making any personal observations. Thus, the seemingly clear and unambiguous dictates of section 5152 were not met.

Nevertheless, the trial court concluded that Norton, the psychologist, and Biala, the psychiatrist, were immune from liability under section 5154. The court found that sections 5152 and 5154 were ambiguous in light of the California Supreme Court's decision in *California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d 1. To harmonize this apparent inconsistency, the trial court read "psychiatrist" as used in sections 5152 and 5154 as "psychiatrist or psychologist." Therefore, the resolution of this appeal is dependent on the construction of sections 5152 and 5154, specifically the scope of the term "psychiatrist."

■ "The court's role in construing a statute is to 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " (*People v. Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].) The first step in this process is to scrutinize the words of the statute, giving them a plain and commonsense meaning. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].) If the language is clear and unambiguous, the plain meaning of the statute governs. (*People v. Snook, supra,* 16 Cal.4th at p. 1215.) However, the literal meaning of a statute must be in accord with its purpose. (*Id.* at p. 1217.) The words of a statute must be construed in context and provisions relating to the same subject matter must be harmonized to the extent possible. (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 659 [25 Cal.Rptr.2d 109, 863 P.2d 179].)

■ On its face, section 5152, subdivision (a) is clear. Only a psychiatrist can release a patient from an involuntary detention before 72 hours have elapsed. The statute does not authorize a psychologist to make this decision. Nevertheless, respondents argued, and the trial court agreed, that because a psychologist's powers were expanded after the LPS Act was enacted, sections 5152 and 5154 are ambiguous in context.

In 1967, the year the LPS Act was added, psychologists were not permitted to take primary responsibility for the diagnosis and treatment of their hospitalized patients. (*California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d at p. 6.) Rather, the State Department of Health Services regulations required that a psychiatrist be in charge of all patients admitted to the psychiatric wards of acute care hospitals. (*Ibid.*) Consequently, a psychologist could not continue in his or her role as the primary mental health care provider for a patient during any period in which the patient required hospitalization.

However, in 1978 the Legislature broadened the role of psychologists in hospital settings through the enactment of Health and Safety Code section 1316.5. That section provides that a hospital may appoint clinical psychologists to its staff and that those psychologists may carry professional responsibilities consistent with the scope of their licensure. The Legislature found and declared that the practice of psychology had been unduly restricted in its access to, and utilization of, health facilities. In enacting Health and Safety Code section 1316.5 the Legislature intended to bring about a change, i.e., to " 'make inpatient care available for psychological patients and to expand staff and professional services that may be offered by health facilities to include licensed psychologists having appropriate training and clinical experience.' " (*California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d at pp. 15-16.)

Nevertheless, the 1983 regulations adopted by the State Department of Health Services continued to require that a psychiatrist supervise diagnosis and treatment of all persons hospitalized for mental illness. It was a challenge to these regulations that was before the court in *California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d 1.

To resolve the issue presented in *Rank,* the court was required to construe Health and Safety Code section 1316.5. After analyzing both the plain meaning and the legislative history of this statute, the court concluded that section 1316.5 meant what it said on its face. Under California law a hospital may admit clinical psychologists to its staff and may permit such psychologists to take primary responsibility for the admission, diagnosis, treatment and discharge of their patients. (*California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d at p. 21.) However, the court also noted that this responsibility "must, of course, be exercised consistent with all other statutes when they apply in a given circumstance, for example, the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.)." (*Id.* at pp. 21-22, fn. 14.)

Based on the *Rank* court's construction of Health and Safety Code section 1316.5, the trial court concluded that Welfare and Institutions Code sections 5152 and 5154 had to be interpreted to provide psychologists with the same authority as psychiatrists in the context of an early release. In support of the trial court's conclusion, respondents and their amici curiae note that when the LPS Act was added, the law assigned psychologists to an inferior, dependent class. However, with the advent of Health and Safety Code section 1316.5, the Legislature placed psychologists and psychiatrists on an "equal footing" with respect to the diagnosis and treatment of mental disorders. Thus, respondents argue that to be consistent with the later passage of Health and Safety Code section 1316.5, Welfare and Institutions Code sections 5152 and 5154 cannot be interpreted to relegate psychologists to a secondary status in connection with discharge decisions. Respondents further point out that because a psychologist can diagnose and treat hospitalized patients, there might not be a "psychiatrist directly responsible" for the involuntarily committed patient.

Respondents' position is unpersuasive for several reasons. First, the current scheme that permits the early release of an involuntarily detained patient only upon the direction of a *psychiatrist* after he or she has personally observed that patient was added to Welfare and Institutions Code section 5152 by amendment in 1985, i.e., after the enactment of Health and Safety Code section 1316.5. Before the 1985 amendment, section 5152 permitted the early release of an involuntarily detained patient "if, in the opinion of the professional person in charge of the facility, or his designee," that patient no

longer required evaluation or treatment. Further, the identical procedure, including the conflict resolution scheme, was adopted for other similar situations either in or after 1985. For example, the decision on whether to release dangerous or gravely disabled patients early who are detained due to inebriation (§ 5170.7) or who are certified for intensive treatment due to mental disorder, chronic alcoholism, or being imminently suicidal (§§ 5257, 5270.35, 5264 & 5309) must be made by a psychiatrist. Thus, Health and Safety Code section 1316.5 does not create a latent ambiguity. ▮▮▮▮ Rather the Legislature, after authorizing psychologists to diagnose and treat their patients in a hospital setting, nevertheless determined that the early release of a dangerous or gravely disabled patient from an involuntary detention required the expertise of a psychiatrist.[2]

▮▮▮ The court's decision in *California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d 1, does not affect this analysis. The *Rank* court concluded that, based on the plain meaning of Health and Safety Code section 1316.5, psychologists were permitted to diagnose and treat patients in hospitals. (51 Cal.3d at p. 14.) However, this decision did not remove the existing restrictions on a psychologist's practice. The court noted that, unlike psychiatrists, psychologists are not authorized to prescribe drugs, perform surgery, or administer electroconvulsive therapy. (*Id.* at p. 12; Bus. & Prof. Code, § 2904.)

The Legislature's requirement that an early release decision be made by a psychiatrist under sections 5152 and 5154 is merely one more relatively narrow restriction on a psychologist's practice. As noted above, the evaluation of a mentally disordered person is inherently uncertain and thus the early release of an involuntarily committed patient poses a significant risk of harm to others. Thus, limiting this decision to the professional who has received training in the detection of organic illness, i.e., a psychiatrist, is neither unreasonable nor inconsistent with the ability of a psychologist to diagnose and treat patients in a hospital within the scope of his or her licensure.

Further, the fact that it may be a psychologist who is responsible for the patient's admission and initial treatment does not create an ambiguity.

---

[2]Appellant and amicus curiae California Medical Association have requested this court to take judicial notice of a bill, Assembly Bill No. 705 (1993-1994 Reg. Sess.), that was rejected by the Legislature. They argue that since this bill would have amended section 5152 to authorize psychologists to release an involuntarily detained patient before 72 hours had elapsed, its rejection is indicative of the legislative intent behind sections 5152 and 5154. However, as has been noted, there "is relatively little value in examining an existing statute in light of proposed amendments which have not been approved." (*Sav-On Drugs, Inc. v. County of Orange* (1987) 190 Cal.App.3d 1611, 1623 [236 Cal.Rptr. 100].) Consequently, the request is denied.

Rather, it is clear from the specific delineation of professional roles contained in the LPS Act that the Legislature intended to add another professional to the patient's care, i.e., a psychiatrist, if necessary.

Respondents and their amici curiae nevertheless contend that this restriction is discriminatory, against the public interest, and in conflict with current and accepted practice. They point out that before a psychologist can practice in this independent health care profession he or she must obtain a doctoral degree, complete two years of supervised experience, and pass the state licensing examination. Based on these requirements, respondents assert that psychologists are qualified to determine whether an involuntarily detained patient should be released before 72 hours have elapsed. However, as noted by the court in *California Assn. of Psychology Providers v. Rank, supra*, 51 Cal.3d at page 21, disputes over the competence of the professions must be settled by the Legislature, not the courts. The Legislature has decided that a psychiatrist must make any early release decision.

As noted above, the provisions of section 5152 were not met in this case. Norton, a psychologist, suspended Ford's involuntary detention. The psychiatrist, Biala, was consulted but did not personally observe Ford before this decision was made. Since section 5154 requires compliance with section 5152, neither Norton nor Biala is exempt from liability. Consequently, the trial court erred in granting the motion for nonsuit.[3]

### DISPOSITION

The judgment is reversed. Costs on appeal are awarded to appellant.

Ardaiz, P. J., and Vartabedian, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 29, 2001. Baxter, J., did not participate therein.

---

[3]Ford also challenges the trial court's denial of his in limine motion to exclude evidence regarding the validity of his original section 5150 detention. The trial court based this ruling on its misconstruction of sections 5152 and 5154. Accordingly, this ruling also falls.