Filed 9/25/25  Shields v. Al-Sadi CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| CLAUDIA SHIELDS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>GHADA AL-ASADI, et al.,<br><br>    Defendants and Respondents. | B327219<br><br>Los Angeles County<br>Super. Ct. No. BC682431 |

APPEAL from judgments of the Superior Court of Los Angeles County, Richard L. Fruin, Judge.  Affirmed.

The Law Office of Sara B. Poster, Sara B. Poster; WLA Legal Services, Bay Cities Law Group, Steven Zelig for Plaintiff and Appellant.

Law + Brandmeyer, Kent T. Brandmeyer; Schmid & Voiles, Denise H. Greer for Defendants and Respondents.

————————————

To get help, a person who twice attempted suicide and who has a history of depression drives herself to a psychiatric hospital. Morally, medically, and legally, the facility is concerned about suicide. The facility places her on an involuntary hold, offers her anti-depression medication that she refuses, and releases her four days later.

Claudia Shields sued after spending four days at a psychiatric hospital against her will. She went to trial against three staff psychiatrists—not against the hospital that held her—on claims for false imprisonment, intentional infliction of emotional distress, and medical malpractice. The trial court nonsuited most of her claims. One malpractice claim remained against the one psychiatrist who treated Shields. The jury decided in this psychiatrist's favor on causation. Shields recovered nothing.

We affirm. We begin by outlining the statutory scheme for psychiatric commitments under the Welfare and Institutions Code. Undesignated statutory references are to this code. Then we sketch a factual overview. Later we add more facts concerning each defendant as we deal with particulars.

I

The governing law is the Lanterman-Petris-Short Act (§ 5000 et seq.) (the Act).

It provides for "prompt, short-term, community-based intensive treatment, without stigma or loss of liberty, to individuals with mental disorders who are either dangerous or gravely disabled." (*Ford v. Norton* (2001) 89 Cal.App.4th 974, 977 (*Ford*).)

In 2016, when Shields was in the hospital, section 5008 defined gravely disabled as "[a] condition in which a person, as a

2

result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (Former § 5008, subd. (h)(1), as amended by Stats. 2013, ch. 567, § 2.)

The Act provides for involuntary commitment over successive periods of increasing duration. (*Julian v. Mission Community Hospital* (2017) 11 Cal.App.5th 360, 375 (*Julian*).)

Section 5150 is the first step in the process. It allows specified professionals "to bring an individual to an appropriate facility for assessment, evaluation, and treatment for up to 72 hours where there is probable cause to believe that the person is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled." (*Julian*, *supra*, 11 Cal.App.5th at p. 375 [quotation marks and citations omitted].)

People who may take this action "include peace officers, members of the staff of the evaluation facility, designated members of a mobile crisis team, and other professional persons designated by the county. Thus, a broad range of personnel can initiate the placement of a mentally disordered individual for the 72-hour evaluation." (*Ford*, *supra*, 89 Cal.App.4th at p. 979.)

Early release is possible, but "[a]n early release from a 72-hour commitment may occur 'only if … the psychiatrist directly responsible for the person's treatment believes, as a result of his or her personal observations, that the person no longer requires evaluation or treatment.' ([§] 5152, subd. (a)[.)]" (*Julian*, *supra*, 11 Cal.App.5th at p. 376 [citations omitted].)

The Act recognizes early release "can pose a risk of harm to others. The evaluation and treatment of mentally disordered persons is inherently uncertain and cannot reliably predict future conduct." (*Ford*, *supra*, 89 Cal.App.4th at p. 979.)

If the patient is not ready to be released after 72 hours and refuses further voluntary hospitalization, the professional staff of the facility may certify the patient for not more than 14 days of involuntary intensive treatment. (§ 5250; 2 CEB, California Conservatorships and Guardianships, Conservatorships for the Gravely Disabled Under the Lanterman-Petris-Short (LPS) Act § 15.3, p. 892.)

The Act provides checks on section 5250 certifications. Those making the certification must provide the specific facts forming the basis for their decision in the notice of certification. (§ 5252.) Section 5259.1 provides that "[a]ny individual who is knowingly and willfully responsible for detaining a person in violation of the provisions of this article is liable to that person in civil damages." Moreover, "[c]ommitments longer than 72-hour detention require a certification hearing before an appointed hearing officer to determine whether there is probable cause for confinement, unless the detainee has filed a petition for writ of habeas corpus." (*Julian*, *supra*, 11 Cal.App.5th at p. 375.) The hearing must take place within four days of the certification, and the patient may no longer be detained involuntarily if no probable cause is found. (§§ 5254, 5256, 5256.5.)

The Act also has an immunity provision, which is a focus of this case. Section 5278 shields hold decisions made "in accordance with the law." The immunity provision "encourages the protection of those endangered by a person suffering from mental disorder." (*Cruze v. Nat. Psychiatric Services, Inc.* (2003) 105 Cal.App.4th 48, 54 (*Cruze*).) Immunity allows professionals authorized to place psychiatric holds to make this decision without fear of exposure to liability. (*Julian*, *supra*, 11 Cal.App.5th at p. 376.)

4

Section 5278 immunity is far-reaching but not absolute. It protects the decision to detain, the detention, and its inherent attributes. Immunity extends to any civil claim based on the fact the plaintiff was detained, evaluated, or treated without consent. It does not, however, cover criminal acts, intentional mistreatment, or negligent evaluation or treatment during a hold. (See *Jacobs v. Grossmont Hospital* (2003) 108 Cal.App.4th 69, 75–79 (*Jacobs*); *Gonzalez v. Paradise Valley Hospital* (2003) 111 Cal.App.4th 735, 737, 741–742.)

## II

Shields began her involuntary stay at Aurora Charter Oak Hospital (Aurora) on Monday, November 7, 2016.

## A

Shields has a Ph.D. in clinical psychology and is a longtime psychology professor. She was chair of her department at the Chicago School of Professional Psychology in November 2016.

Shields had cognitive issues before the key date of November 7, 2016. She had complained of brain fog since 2013. She experienced depression, anxiety, poor concentration, memory problems, insomnia, and work stress. She easily became overwhelmed.

Shields asked her primary care physician Dr. Yen Lai to help her get a reduced work schedule.

Shields visited Lai on Monday, October 31, 2016—one week before the events of November 7, 2016.

Shields told Lai she was suffering from depression, work stress, and concentration problems. Shields did not want to engage with people.

Shields was getting upset and going to " 'a dark place' " at work.

5

She had been thinking about harming herself.

She had not, however, formulated a concrete plan for suicide.

On the crucial day of Monday, November 7, 2016, Shields experienced a 45-minute episode of confusion and inability to function at work.

Shields went to her doctor's office, where she was visibly distraught.

Shields told the receptionist she had fleeting thoughts of hurting herself.

The receptionist gave her a list of counseling centers. Shields called one name on the list, and the voicemail message referred her to Aurora Behavioral Health for urgent but not emergency matters.

Aurora is a psychiatric hospital less than two miles from Shields's home. Shields used to drive by it regularly. She knew it was a psychiatric hospital and knew it did not provide emergency medical services.

In other words, you would go there for psychological, as opposed to physical, problems.

Shields called Aurora. A man asked her about insurance and directed her to Aurora's assessment center, which is adjacent to the hospital. Shields drove there on November 7th.

When she arrived, Aurora staff took her belongings and searched her. Shields had an intake interview with Aurora employee Tina Davis, who was not a defendant in this case.

Shields agreed to stay overnight at Aurora. She signed a form requesting voluntary admission to Aurora.

At trial, however, Shields and Davis disagreed about their interaction.

According to Shields, Davis made statements to get Shields to stay overnight.

Davis denied this.

Shields and Davis also disagreed about the pre-admit screening form Davis completed while they met. This form attributed statements to Shields.

Davis testified she accurately recorded Shields's statements.

Shields disputed this.

The form documented Shields's chief complaint as follows: "Claudia came into [Aurora] seeking assessment for recent issues with memory loss, increased anxiety and feelings of being overwhelmed. Upon face to face Claudia reports a recent decrease in both sleep and appetite. . . . Increased stress at work. 'I can't remember doing things, I can't concentrate. The simplest tasks and I can't function.' Claudia is also dealing with her ex-husband having 6 months to live and how this is going to affect her 13 yr old daughter. 'I've had thoughts to hurt myself, especially when I'm not doing well at work.' "

The form continued to attribute direct quotations to Shields.

" 'I've thought about cutting my wrists again. I do have the fear I won't stop, that I will keep going and really commit suicide.' "

The form noted Shields had increased thoughts over the last four to eight weeks of cutting her left wrist. Davis identified the provisional diagnosis needed for admission purposes as major depression, severe recurrent without psychosis.

Another part of the form stated Shields said she had been admitted to other psychiatric hospitals. When asked how many times, Shields could not recall.

The screening form is long and detailed and was a focal point at trial. Shields acknowledged much of its content came from her, but other parts were fabricated. She conceded she had thoughts of hurting herself. She denied she was suicidal. Shields criticized Davis for omitting the 45-minute episode at work, among other things. She acknowledged information about her history reflected in the form was true, though remote. She was a victim of rape, molestation, and physical abuse. She had had severe depression and had been on four different antidepressant medications in the past.

Shields admitted she had attempted suicide twice. She admitted she had a history of cutting herself. She also had several psychiatric hospitalizations.

Shields maintained, however, that, after her daughter was born in 2003, she never again considered suicide.

Defendant Dr. Said Jacob is a psychiatrist. He approved Shields's request for voluntary admission over the phone. He never saw Shields or assessed her and never signed the admission form, which has a certification portion for an attending physician.

Shields said she was locked in a prison-like unit and eventually was placed in something like solitary confinement.

Shields said she wanted to leave.

Around 11 p.m. on November 7th, nurse Denise Reiser decided Shields posed a danger to herself and initiated a 72-hour psychiatric hold under section 5150.

Reiser's notes documented Shields was "highly anxious" and complained of memory loss and feeling overwhelmed.

Reiser noted the probable cause for the hold as follows: Patient stated her former husband "is dying + concerned about how she will tell her [daughter.] Has had thoughts to cut her wrist of which she has a hx. of. (scar on (L) wrist). She has had 2 prior suicide attempts. Has had increasing thoughts to cut over past few mths."

Shields testified she wrote a letter to Davis explaining her notes were inaccurate, she was safe and not suicidal, and she was primarily concerned with the memory issues she experienced at work. The note says, "I did tell you that sometimes I do think of cutting" but also "I DO NOT WANT TO CUT MYSELF."

Shields testified she gave the note to Reiser and asked to get Davis on the phone to "talk this through," as there had been a misunderstanding. The note was not in the hospital's chart, but plaintiff's counsel introduced a somewhat legible copy at trial.

The next morning, on November 8th, internist Dr. Oliver Solomon examined Shields to rule out any emergency medical situation. His report shows he conducted a neurologic examination, among other exams. Solomon documented Shields had bilateral knee pain and a form of neuropathy known as CIDP, but there was no emergency medical issue or acute neurologic condition. Solomon cleared Shields to stay. He recommended she follow up with her primary care doctor and her rheumatologist upon discharge and see a neurologist for her memory issues.

Shields testified the meeting with Solomon lasted about five minutes, and when she told him about the 45-minute episode at work, he "looked panicked" and blurted out that she should have

9

had an emergency CT scan; then he "gathered himself, as if on script" and reversed course.

Solomon had no recollection of this and testified he "would never say something like that to a patient and not act on it."

Defendant Dr. Ghada Al-Asadi is the second psychiatrist. She also met with Shields the morning of November 8th. She became the attending physician responsible for Shields's hospitalization.

Before meeting with Shields, Al-Asadi reviewed the screening form, the 5150 hold documentation, and other records.

Al-Asadi's initial report said Shields told her about her increasing depression.

Shields also said she had used the antidepressant medication Effexor in the past.

The report documents that Shields had a sad affect and a depressed mood.

Shields was eating and sleeping poorly, had poor memory and was unable to concentrate, and had little energy and motivation. At the same time, Shields was alert and properly oriented. She had clear thoughts, coherent speech, and fair judgment and insight about her illness.

Al-Asadi diagnosed Shields with major depressive disorder, recurrent with no psychosis, and cognitive disorder, not otherwise specified.

Al-Asadi determined Shields's symptoms were very serious, Shields was a danger to herself, and she was very high-risk. Al-Asadi estimated the length of stay as three to seven days. Her treatment plan included participating in various therapies and resuming the antidepressant Effexor.

Al-Asadi ordered a family meeting. She testified these meetings typically are a mandatory part of the investigation and an important way to gain insight into the patient.

As would transpire, however, this family meeting did not happen until November 10th, after a second hold was placed. The parties dispute the reasons for the delay, as shortly will appear.

Al-Asadi saw Shields each remaining day Shields was at Aurora.

Shields maintained each visit was short (typically five to ten minutes) and Al-Asadi was cold, rushed, and uncaring. Shields told her about the 45-minute episode at work.

Al-Asadi noted Shields minimized and denied statements from her admission, which was not unusual.

Al-Asadi recognized Shields should see a neurologist if her confusion problems continued. She told Shields they could be symptoms of depression but were more likely a medical condition with a non-psychological cause.

Al-Asadi concluded Shields was not experiencing a *medical* emergency at Aurora, meaning that the immediate problem was psychological rather than physical. Al-Asadi explained she needed to balance Shields's assurances with her concerns for Shields's safety in light of her "very high-risk factors," like Shields's past suicide attempts.

According to Al-Asadi, patients are more likely to harm themselves when they lack family support, and Al-Asadi had to ensure Shields had support.

Al-Asadi ordered a "family meeting ASAP" on November 9th. She told Shields a successful meeting was essential before Aurora would discharge Shields.

11

Aurora's records show many people visited Shields: doctors, nurses, therapists, a social worker, a case manager, and others.

Shields maintained Aurora personnel made up things about her and then simply copied lies verbatim throughout the chart. She felt she did not receive treatment for depression at Aurora, apart from the offer of Effexor, which she rejected.

Shields started experiencing headaches and other pain related to the chronic medical conditions she had (neuropathy in her legs and spontaneously dislocating knees) that went untreated.

Shields repeatedly claimed that she was not suicidal or depressed, that she would not hurt herself, and that she wanted to leave. She felt powerless there. She also felt Aurora personnel were cruel and were "gaslighting her"—trying to make her feel like she had not overcome her history of suicidal depression when she had.

The trial featured conflicting evidence about whether Shields was cooperative at Aurora.

On one hand, Shields testified she did nothing to delay the family meeting.

On the other hand, chart notes show Shields was uncooperative. The notes say Shields refused to have the family meeting and refused to take the Effexor that Al-Asadi had prescribed to combat depression. The notes also say Shields reported she had no support system and refused to allow hospital staff to contact her family or friends.

Shields testified that she was concerned about sharing personal information about her family and that she refused to do so initially because she distrusted Aurora personnel. Shields also maintained she had "tremendous" support.

Shields testified she did not need antidepressant medication because she was not depressed, although she had "moments of sadness and work stress[.]"

A family meeting eventually was scheduled for November 10th, the final day of the 5150 hold, around 1 p.m.

Shields did not leave Aurora when the 72-hour hold was set to expire on November 10, 2016.

She did leave the next day, on November 11, 2016.

The parties disputed the circumstances of Aurora's discharge of Shields.

According to Al-Asadi's notes, Shields on November 10th agreed to "sign voluntary," which meant Al-Asadi could discharge her over the phone after the family meeting, *if it went well*. Al-Asadi made this arrangement and left the hospital after meeting with Shields.

Shields testified she did not recall a discussion about "signing voluntary." She maintained this discussion would not make sense because, when the nurse presented the form to her, Shields believed she was being discharged. Shields testified she did not agree to a further voluntary stay.

Shields refused to sign the voluntary form.

A nurse called defendant Dr. Cesar Cruz to see Shields and to evaluate the situation.

Cruz is the third psychiatrist in this case.

Cruz met with Shields midday on November 10, 2016, before the scheduled family meeting. Cruz did not know when the meeting would occur but knew the 72-hour hold was set to expire later that very day, on November 10, 2016.

Before the 72-hour hold expired, Cruz certified Shields for further treatment under section 5250.

The parties provided vastly different accounts of how this happened. Shields testified she may have had a brief encounter with Cruz, but Cruz did not examine her, run tests, or discuss activities of daily living. By contrast, Cruz maintained he personally examined Shields during the course of a meeting lasting from about 20 to 40 minutes. According to Cruz, they discussed the "transition from a 5150 to 5250," which Shields understood. Cruz testified he reviewed the entire chart and talked extensively with staff about Shields beforehand. He dictated a note about the meeting with Shields. This dictation was not transcribed, which Cruz said happens routinely, as he has an accent and speaks quickly. He did not recall checking for the transcription. He had been brought in for a consultation only.

Cruz agreed with the diagnosis of major depressive disorder. He was aware Shields denied wanting to hurt herself or having suicidal ideation. But Cruz was concerned there were multiple red flags beyond depression that undermined Shields's ability to provide for herself safely. The red flags included her memory lapses and concentration issues, her past attempts to kill herself, her recent thoughts of self-harm, her reversal on staying voluntarily, and her resistance to a family session. He explained the family session was a vital piece of information about Shields's safety. That piece was missing, for the family session had not happened. There was no safety plan in place. Cruz believed he could not ensure her safety at home.

Cruz concluded Shields was gravely disabled. He completed the required notice of certification for further treatment at Aurora. This event triggered the 5250 hold, meaning Aurora

14

would not discharge Shields when the 5150 hold reached the 72-hour mark.

Shields testified she was concerned by the new hold but knew it was invalid and would entitle her to a court hearing.

In the afternoon of November 10th, Shields did participate in the family meeting with two others: a friend and a therapist. The meeting went well, and the therapist recommended Shields's release.

Al-Asadi testified she did not learn about either Shields's refusal to "sign voluntary" or Cruz's hold until the next day, November 11, 2016.

The morning of November 11th, Al-Asadi met with Shields and had a phone call with Shields's priest, Reverend Dr. Sally Howard, who has two psychology doctorates. Howard disagreed Shields was gravely disabled. According to Howard, Al-Asadi tried to justify the extended hold and maintained they needed a "status" for Shields. Howard believed the hold was illegal.

Al-Asadi ordered Shields's discharge after the call, around 10 or 11 a.m. on November 11, 2016.

Al-Asadi's discharge summary shows she recommended Shields see a neurologist as soon as possible. Al-Asadi recognized cognitive symptoms like those Shields reported could signal a transient ischemic attack, a kind of precursor to a stroke. But she noted Solomon had assessed Shields and found nothing wrong with her brain and no acute medical situation. Al-Asadi advised Shields to go to the emergency room if a similar episode happened again. She arranged a neurologist appointment for Shields.

On November 12th, the day after her discharge, Shields went to an Urgent Care clinic due to a migraine and blurred

vision. The clinic gave her an injection and told her to take pain medication.

A few days later Shields visited Lai, complaining of acute cognitive processing issues. Lai ordered magnetic resonance imaging: an MRI. The MRI scan led to the discovery of an aneurysm, which is a bulge in the side of a blood vessel. Shields underwent elective surgery to repair the aneurysm in December. The imaging showed no evidence of a stroke or a transient ischemic attack.

Shields claimed she suffered nightmares, chronic migraines, and post-traumatic stress disorder (PTSD) from being hospitalized against her will at Aurora. She went on medical leave from work. She was "effectively demoted" from her Chair position because she was not able to keep up, and she lost income as result.

In April 2017, Shields started seeing Dr. Kamala Thomas, a psychologist, who diagnosed Shields with PTSD. As of trial, Thomas had had about 170 sessions with Shields. She testified Shields would need lifelong treatment.

B

A year after her experience at Aurora, Shields sued Aurora, its parent company, Al-Asadi, and Jacob. She later added Solomon and Cruz as defendants. Defendants Jacob, Al-Asadi, and Cruz were the three psychiatrists.

The trial court sustained, without leave to amend, the psychiatrists' demurrers to Shields's claim for dependent adult abuse under section 15600, et seq., on the ground that the complaint outlined a claim for professional negligence, not neglect as the dependent adult abuse statute defined it.

This left three claims against the psychiatrists: false imprisonment, intentional infliction of emotional distress, and medical malpractice. Shields contended Al-Asadi and Cruz were Jacob's agents, and he was liable for their acts and omissions.

Shields settled with some defendants but went to trial against the three psychiatrists: Jacob, Al-Asadi, and Cruz. Her case-in-chief featured testimony from psychiatric expert Dr. Randolph Noble, economic damages expert Darryl Zengler, Thomas, Lai, Howard, Shields's roommate, her longtime close friend, the coworker who succeeded her as Chair, and Shields herself. Shields also called the three psychiatrist defendants as witnesses.

Noble opined all three had deviated from the standard of care in various ways. Noble acknowledged he never has had staff privileges at a psychiatric facility like Aurora and never has been certified to place holds under the Act. He attacked Aurora's recordkeeping. He emphasized "protective" factors about Shields and observations in her chart that showed she was not depressed, gravely disabled, or a danger to herself. Noble acknowledged Shields was a psychology professor who chose to drive herself to a psychiatric facility and not an emergency room; she had been admitted to psychiatric facilities before; and she knew their routines.

Various witnesses described Shields before and after her experience at Aurora. Their testimony depicted Shields as a dedicated mother, poised professional, and high-functioning person who seemed neither depressed nor at risk of self-harm in the weeks and years before Aurora, but who changed drastically after Aurora as a result of that experience.

17

Lai testified about Shields's medical condition before and after Aurora. She confirmed various cognitive and mental health complaints by Shields before Aurora and her cognitive and PTSD symptoms afterward. Lai was not concerned Shields would harm herself in October 2016 because she had insight and no plan. Nor was she concerned then that Shields could not take care of her basic needs. Records from Lai's clinic showed Shields reported PTSD from several traumatic experiences *in 2020 and 2021* unrelated to Aurora.

Thomas tied Shields's PTSD and chronic migraine syndrome to her experience at Aurora. She opined Shields likely would experience PTSD for the rest of her life. Zengler discussed Shields's damages, which admittedly stemmed from the assumption Shields was wrongly imprisoned.

After the close of Shields's evidence, all three defendants moved for nonsuit on each cause of action under Code of Civil Procedure section 581c. The trial court reviewed both sides' written submissions and held a lengthy hearing. The court provided an oral tentative ruling at the outset, saying it was inclined to grant the motion in large part. Plaintiff's counsel requested leave to amend to add back the claim for dependent adult abuse. The court refused this relief.

The court held to its ruling at the end of the hearing and ruled Al-Asadi and Cruz were not Jacob's employees. The only claim that survived was the medical malpractice claim against Al-Asadi.

In the defense case, the jury heard from Al-Asadi again, as well as from Davis, Solomon, and two experts: a psychiatrist and a neurologist. This psychiatrist opined on the standard of care and the purpose and typical length of involuntary psychiatric

holds.  He explained Al-Asadi's actions were appropriate and protective, agreed with her diagnosis, and said Shields's stay at Aurora was life-saving.

The neurologist undercut various elements of Shields's malpractice claim.  He testified aneurysms usually are congenital from birth.  Shields's aneurysm was asymptomatic, meaning that it created no symptoms.  As a result, there was no reason for these doctors to suspect Shields had one.  Shields also had a history of migraines, and her overuse of pain medicine transformed her episodic headaches into chronic headaches.  Shields was not suffering from any neurologic emergency at Aurora and did not need emergency imaging.

Solomon confirmed his job was to make sure the patient is stable and had no acute medical problem requiring a transfer.  He evaluated Shields and found no acute or emergency medical problem of any kind.

Davis had conducted intake interviews at Aurora for five years as of November 2016.  She said her role did not require licensing.  She did not make clinical decisions; rather, she was merely a scribe who wrote down what patients said.  Davis used quotation marks to signify exact statements by patients, including on Shields's form.  Davis denied falsifying screening forms.

Shields provided brief rebuttal testimony about her room at Aurora.

After deliberating for less than four hours, the jury reached its verdict.  It found Al-Asadi was negligent, but her negligence was not a substantial factor in causing harm to Shields.

Shields moved for a new trial.  The court denied her motion.

## III

Shields's appeal largely focuses on the nonsuit rulings. Shields also argues the trial court improperly dismissed the dependent adult abuse claim before trial and improperly denied her request to proceed with the claim at trial. Shields concludes her lengthy opening brief by reciting the contents of her motion for new trial but making no related argument, thereby forfeiting any challenge to the ruling on the motion for a new trial. (See *Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863, 867, fn. 1 (*Haley*) [issues lacking argument are forfeited].)

We affirm.

## A

Nonsuit is proper if the evidence cannot support a judgment in the plaintiff's favor. (*Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 684 (*Lopez*).)

We independently review these rulings, accepting as true the evidence favorable to the plaintiff, drawing all legitimate inferences in plaintiff's favor, and disregarding conflicting evidence. We neither weigh evidence nor assess witness credibility. (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 347 (*O'Neil*); see also *Haley, supra,* 153 Cal.App.4th at p. 876 [review is independent].)

We nevertheless require evidence showing a viable path on each claim. Nonsuit is proper if the plaintiff's proof is merely speculation or conjecture. (*Lopez, supra,* 196 Cal.App.4th at p. 684.)

On independent review, we conclude the trial court's result was correct.

Shields's appellate briefs often lump the defendants together along with Aurora staff, which is unhelpful in

determining whether a nonsuit was proper as to the claims against any individual based on that individual's conduct. We focus on each defendant separately, viewing the evidence from Shields's case-in-chief in the light favorable to Shields. (See *O'Neil*, *supra*, 53 Cal.4th at p. 347.)

1

Starting with psychiatrist Jacob, Shields's evidence did not support a judgment in Shields's favor. After she drove herself to Aurora for help, Shields had no case against this doctor who merely approved her admission to Aurora.

Jacob's role was minimal. He never interacted with Shields and did not place an involuntary psychiatric hold. He gave admission orders over the phone for Shields's *voluntary* admission after speaking with an Aurora employee about the case. That is all. He never saw Shields and was not involved in her care. He never made notes about her. He did not bill for the one call he had about her. He was not Shields's attending physician responsible for her hospitalization and care. That role belonged to Al-Asadi.

While Jacob's name appears throughout the chart as the "Doctor" or "Att" (for attending), or similar designations, this evidence does not give rise to a reasonable inference of further involvement given the undisputed evidence of Jacob's minimal role. Jacob's name appeared throughout the chart because he was on call that first day and was the one who admitted Shields. No evidence countered this point.

Considering Jacob's undisputed minor involvement, nonsuit was proper on each claim.

There was no false imprisonment. Involuntary hospitalization can constitute false imprisonment. (See *Julian*,

21

*supra*, 11 Cal.App.5th at p. 382.) But Jacob was not involved in the holds here. He enabled Shields's *voluntary* admission after she drove herself to Aurora and completed the intake. No evidence created an inference Jacob confined Shields against her will. (See CACI No. 1400; *Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 715 [claims for false imprisonment require nonconsensual, intentional confinement by the defendant, without lawful privilege, for an appreciable period].)

There was no intentional infliction of emotional distress. That tort requires extreme and outrageous conduct. The conduct must exceed all bounds usually tolerated in a civilized community. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051 (*Hughes*).)

Trial courts properly act as a gatekeeper on this issue. (See *Hughes*, *supra*, 46 Cal.4th at p. 1051 [affirming summary judgment on this basis]; *Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 534 (*Berkley*) [whether challenged conduct is outrageous is a question of law initially committed to the court and goes to the jury only if reasonable minds may differ].)

As a matter of law, Jacob's conduct was not outrageous. Shields does not argue otherwise on appeal, which ends the issue.

There was no medical malpractice. No evidence showed Jacob's conduct falling below any standard of care. (See *Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305 [medical malpractice cause of action includes the elements of duty and breach and requires the plaintiff to prove through expert testimony that the defendant's treatment fell below the standard of care]; CACI Nos. 501 & 502; see also *Lopez*, *supra*, 196 Cal.App.4th at p. 684 [plaintiffs cannot prevail against a nonsuit

22

motion unless they demonstrate substantial evidence in the record to support each claim].)

According to Shields, Jacob was at fault because he "literally 'called it in.' " She points to Noble's testimony, which blamed Jacob for not explaining the voluntary admission form to her, for relying on a deficient history taken by hospital staff, and for not immediately referring Shields to the emergency room in light of the 45-minute work episode.

Noble's testimony is not a valid basis for attacking the trial court's ruling on the Jacob nonsuit. Three separate flaws ruin Shields's argument.

First, Noble made speculative assumptions to support his conclusions. He admitted he had no idea what Jacob was told about Shields. Jacob testified he did not remember this conversation. This lack of evidence is not evidence supporting a claim. The nonsuit was proper on this claim. (See *Lopez*, *supra*, 196 Cal.App.4th at pp. 684 & 689; see also *id.* at p. 689 [expert opinions may not be based on assumptions of fact without evidentiary support or on speculative factors].)

Second, Shields testified she read the voluntary admission form completely before signing it. The form warned of the possibility of involuntary commitment. Shields thus was aware of this warning. An additional and superfluous failure to warn could not cause her harm. (See *Berkley*, *supra*, 152 Cal.App.4th at p. 526 [proximate cause is an element of any negligence claim].)

Third, Shields's expert negated the inference Jacob acted wrongly. Noble conceded that there was a rationale for admitting Shields as a danger to herself, that she should have been voluntarily admitted, and that admitting someone to a

23

psychiatric hospital voluntarily over the phone is routine. Consistent with this evidence, Al-Asadi confirmed doctors can issue admission orders over the phone without seeing the patient.

Nonsuit was proper as to Jacob.

2

Moving to Cruz, Shields's case established section 5278 immunity covered Cruz's actions and shielded him from liability on all three claims. No evidence met the high statutory standard for exceptions to liability: that is, no evidence showed Cruz *knowingly detained Shields in violation of the law*. (See § 5259.1.)

The statute sets a towering barrier: the plaintiff must prove the defendant doctor *knew he was breaking the law.*

Trial courts properly rule on this immunity as a legal matter. (See *Cruze*, *supra*, 105 Cal.App.4th at p. 53.)

It is undisputed Cruz's sole involvement was on November 10, 2016, when Cruz certified Shields for further treatment under section 5250. For Shields, this meant extending her stay at Aurora overnight, for about an extra 14 hours.

We independently consider section 5278's applicability and construe the statutory scheme. (See *Julian*, *supra*, 11 Cal.App.5th at p. 374.) Our starting place is the statute's words. (*Hughes*, *supra*, 46 Cal.4th at p. 1045.)

Section 5278 provides, in relevant part: "Individuals authorized under this part to . . . certify a person for intensive treatment pursuant to Article 4 (commencing with Section 5250) . . . shall not be held either criminally or civilly liable for exercising this authority in accordance with the law." Under section 5250, a psychiatrist may certify an already detained person for not more than 14 days of intensive treatment provided

24

"[t]he professional staff of the agency or facility providing evaluation services has analyzed the person's condition and has found the person is, as a result of a mental health disorder . . . , a danger to others or to themselves, or is gravely disabled." (§ 5250, subd. (a).)

Undisputed evidence shows Cruz did just that.

In accordance with section 5250, Cruz found Shields was gravely disabled. (See former § 5008, subd. (h)(1), as amended by Stats. 2013, ch. 567, § 2.) Consistent with the law, Cruz recognized safety concerns are part of the calculus and the patient's support system bears on the grave disability determination. (See § 5250, subd. (d)(1) ["a person is not 'gravely disabled' if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic personal needs for food, clothing, or shelter"].)

After reviewing the chart and speaking with the hospital staff, Cruz agreed the proper diagnosis for Shields was major depressive disorder, which was "all across the charting[.]" Cruz explained multiple risk factors beyond depression raised concern that Shields could not safely provide for herself. These factors included her memory lapses, her concentration issues, her psychiatric history, and her behavior at Aurora. At the same time, he was missing vital information about her safety: he did not know when, or if, a family session would occur, or whether Shields had a safe home environment to which to return. He worried about her being discharged near midnight, when the 5150 hold was set to expire.

Cruz filled out a notice of certification that tracked the required form. (See § 5252.) It says: patient presented to Aurora

25

after placed a 5150 for danger to self, stating thoughts of cutting self, continues to be guarded, will continue to monitor, plus eval, unable to formulate safe plan. According to Cruz, the new hold would enable a safe plan to be formulated.

Shields's evidence did not take Cruz outside of section 5278's protection.

Shields did not recall interacting with Cruz and acknowledged she may have had an extremely short encounter with him. Shields did not come close to proving Cruz *knew he was breaking the law.*

Noble focused on the validity of Cruz's conclusion and testified nothing *in the chart* supported this hold. The foundation for this opinion is faulty, as Cruz testified his exam note had not been transcribed and thus was not in the chart. Obviously, though, Cruz's thoughts were in Cruz's mind. This proof about Cruz's state of mind was not proof Cruz thought he was breaking the law. It is proof to the contrary.

Moreover, whether another doctor would have reached a different conclusion about Shields's condition does not affect the immunity under section 5278.

Shields relies on cases analyzing section 5150 holds and appears to claim nonsuit was improper because there was conflicting evidence on the existence of *probable cause* to detain. But the issue here is certifications under section 5250, not probable cause determinations under section 5150. Shields did not proceed at trial against the hospital or the people who detained her under section 5150.

We explain this difference between sections 5150 and 5250.

Section 5150 allows many different actors, including police officers and other non-medical personnel, to place someone on an

26

initial 72-hour hold. Probable cause is written into section 5150. This statutory safeguard makes sense in this context, because a broad array of people without medical licenses can initiate the hold. (See *Ford, supra,* 89 Cal.App.4th at p. 979.)

In contrast, section 5250 does not mention probable cause. Certifications under this provision must be made by professional staff at the facility. (§§ 5250 & 5254.) The statutory scheme thereby displays more deference to credentialed psychological professionals, although it keeps them on the hook to the extent it expressly permits liability for those who "knowingly and willfully" detain in violation of section 5250. (See § 5259.1.) Shields never mentions section 5259.1, and she points to no evidence showing any subjective belief by Cruz that he was detaining her in violation of section 5250.

The crucial evidence that Cruz subjectively believed he was violating the law is entirely missing. All the evidence contradicts this subjective belief.

Shields implies Cruz acted badly by imposing a second hold (based on Shields's grave disability) that contradicted the earlier hold (based on the risk she posed to herself). The holds were placed at different times, and they are not mutually exclusive. In other words, by certifying Shields was gravely disabled, Cruz was not saying she was at no point a danger to herself.

In any event, the stated basis for the section 5250 certification does not show Cruz knew he was breaking the law. This evidence did not negate the immunity of section 5278.

Shields relies on statements about the certification attributed to Al-Asadi in claiming Cruz acted wrongfully. But Al-Asadi played no part in this certification and did not speak with

27

Cruz about Shields or the hold.  Her comments do not shed light on Cruz's state of mind when he acted.

Cruz testified he certified Shields for further treatment after she changed her mind and would not sign for voluntary treatment.  Section 5250, subdivision (c), *requires* that the facility present the option of voluntary treatment before extending the patient's involuntary commitment.  Thus, contrary to Shields's arguments, seeking to transition Shields back to a voluntary admission was proper and does not suggest retaliation was the aim.

Shields argues Cruz extended her commitment for his convenience and for financial reasons.  The record does not support either inference.  Nothing countered Cruz's testimony he was brought in for a one-time consultation, he was concerned about Shields's safety, he did not bill for this matter, and he received no money and had no incentive for extending Shields's care.  (See also *Lopez*, *supra*, 196 Cal.App.4th at pp. 684–685 [inferences much be logical and reasonable, not based on mere possibility or flowing from speculation or conjecture].)

Cruz's certification decision was "in accordance with the law" and was protected by section 5278 immunity.  This immunity applies to all three causes of action because all three necessarily center on Cruz's decision to extend Shields's commitment at Aurora, and Cruz did not treat Shields.  (See *Jacobs*, *supra*, 108 Cal.App.4th at p. 78 [immunity covers the decision to detain and extends to claims based on facts inherent in an involuntary detention].)

3

Finally, we turn to Al-Asadi.  Recall the medical malpractice claim against her went to the jury, which returned a

defense verdict based on causation. Thus, we address only the claims for false imprisonment and intentional infliction of emotional distress.

a

There was no legal basis for Shields's false imprisonment claim. Al-Asadi did not restrain, confine, or detain Shields. (See CACI No. 1400.)

Shields's opening brief concedes "Al-Asadi did not place either of the holds[.]" Indeed, when Al-Asadi first got involved, on November 8, 2016, the first hold was already in place, permitting Shields's detention for 72 hours. Noble conceded facts documented by Aurora employee Davis, if true, made it rational to detain Shields under section 5150.

Shields's position appears to be Al-Asadi wrongly *maintained* the holds. But she cites no authority for the proposition that a treating doctor can be liable for false imprisonment on this basis. Nor would this basis for potential liability be sensible, for a treating psychiatrist in a short-term psychiatric hold is and should be focused on patient safety and psychiatric treatment, not on reevaluating a past hold decision made by others. (Cf. *Brimmer v. Cal. Charter Medical, Inc.* (1986) 180 Cal.App.3d 678, 683–685 [upholding nonsuit of claims for false imprisonment and intentional infliction of emotional distress in three doctors' favor, including one doctor who interviewed the plaintiff at the psychiatric hospital that held the plaintiff, where there was no substantial evidence they participated in the decision to detain].)

At the trial court, Shields pointed to section 5152—the early release provision applicable to 5150 holds—and maintained this provision authorized liability for false imprisonment by Al-

29

Asadi. Shields did not renew this argument in her opening brief and thereby forfeited it.

Even absent forfeiture, section 5152 is not a *requirement* that a psychiatrist release a patient early regardless of concerns for patient safety. It says, with our emphasis, the person "shall be released before 72 hours have elapsed *only if*" the treating psychiatrist believes, based on personal observation, that the person no longer requires evaluation or treatment. (§ 5152, subd. (a), italics added.) Al-Asadi did not make this finding. She consistently maintained a family meeting was an important and necessary part of the evaluation of Shields and consistently called for this meeting to ensure Shields would be safe upon release. (Noble also acknowledged "a successful family meeting is required" for discharge, and this meeting could "shed important light" on the probability of suicide.) Al-Asadi had arranged for Shields to "sign voluntary" to enable her discharge after the meeting, if it went well. She was not part of Cruz's certification decision imposing a new hold before this meeting. And she ordered Shields's discharge upon her first encounter with her thereafter. Section 5152 is not a basis for liability here.

Shields notes Al-Asadi acknowledged the 72-hour hold could have been withdrawn at any time. But having the power to discharge a patient early does not mean it is appropriate to discharge any given patient before completing an evaluation. Al-Asadi's statement is no concession Shields should have been released before a successful family meeting took place.

b

Shields's claim for intentional infliction of emotional distress was deficient. Al-Asadi's conduct was not extreme and outrageous as a matter of law. (See *Hughes*, *supra*, 46 Cal.4th at

pp. 1050–1051 [court properly determined the defendant's conduct was not so outrageous as to permit recovery].)

Claims centered on medical diagnosis and treatment ordinarily will not be considered outrageous unless bad faith is involved. (*Berkley*, *supra*, 152 Cal.App.4th at p. 534.) Phrased differently, mere failure to meet a standard of care is not extreme and outrageous conduct.

The evidence does not support a reasonable inference of bad faith by Al-Asadi. Indeed, Noble conceded Al-Asadi and the other defendants attempted to do right by Shields.

Shields identifies various acts and omissions by Al-Asadi throughout her briefs, emphasizing the following: Al-Asadi signed and dated the superseded voluntary admission form more than a week after Shields's discharge, when staff made her aware it needed a signature; Al-Asadi suspected Shields may have had a transient ischemic attack, yet she failed to investigate adequately the reported memory and confusion problems and failed to arrange for a neurological consultation and imaging during Shields's stay at Aurora; Al-Asadi recognized the importance of a family meeting but failed to follow through with it; and Al-Asadi failed to discharge Shields earlier and to arrange for her discharge adequately.

These acts, and the others identified in Shields's brief, may have given rise to a claim for medical malpractice, but they do not give rise to a reasonable inference of bad faith and do not otherwise amount to outrageous conduct. This is particularly true given Noble's concession about Al-Asadi's high-minded motives. It is all the more so true in light of Shields's undisputed psychiatric history and Solomon's undisputed medical clearance of Shields to stay at Aurora.

31

Because Al-Asadi's conduct was not extreme and outrageous, granting a nonsuit on her claim for intentional infliction of emotional distress was proper. (See *Cortez v. Macias* (1980) 110 Cal.App.3d 640, 650–653 [nonsuit proper on mother's claim for intentional infliction of emotional distress based on her child's doctor's refusal to treat the child at the hospital after examining, diagnosing, and prescribing medicine for the child, who later died].)

4

We need not delve into Shields's arguments about Jacob's vicarious liability.

Vicarious liability means liability solely through the acts of an agent. "The employer's liability is wholly derived from the liability of the employee. The employer cannot be held vicariously liable unless the employee is found responsible." (*Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1423.)

The defense verdict on causation means there is no possible vicarious liability for Al-Asadi's negligence. (See *Toste v. CalPortland Construction* (2016) 245 Cal.App.4th 362, 371–372 [a judgment on the merits in an employee's favor bars recovery against the employer based on vicarious liability].) If Al-Asadi did not cause Shields's damages, then Jacob did not cause them vicariously.

We need not discuss the other claims against Al-Asadi and Cruz because we have found they properly were nonsuited.

B

We affirm the challenged demurrer rulings, and the trial court's refusal to permit Shields leave to amend or to revive the

dependent adult abuse claim, because Shields did not adequately brief these issues on appeal and thereby forfeited them.

Shields had the burden to demonstrate error.  For demurrers sustained without leave to amend, this means showing the complaint alleges facts sufficient to establish every element of the cause of action.  (*Rakestraw v. Cal. Physicians' Service* (2000) 81 Cal.App.4th 39, 43.)  To show there is a reasonable possibility of amendment, plaintiffs must specify how they can amend the complaint to change its legal effect.  (*Id.* at pp. 43–44.)

More generally, Shields had the burden to supply cogent argument on her appellate issues, supported by legal analysis and authority.  (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146, 153; see also *Crawley v. Alameda County Waste Management Authority* (2015) 243 Cal.App.4th 396, 404 [appellant must frame the issues for the appellate court, show where the superior court erred, and provide proper record and legal citations; review is limited to the issues adequately briefed].)

Shields's opening brief does not identify the elements of a dependent adult abuse claim.  It does not discuss ways Shields could amend her pleadings successfully.  It does not apply the law to the facts concerning each defendant to show why she had any viable claim here.  Shields's only argument is the defendants considered her a "dependent adult" and they "*cannot have it both ways*"—which says nothing about any other element and does not show how the claim was viable against any defendant.  Shields does not establish error.

//

//

33

## DISPOSITION

We affirm the judgments and award costs to respondents.


WILEY, J.

We concur:


STRATTON, P. J.


RUBIN, J.[*]

---

[*] Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.